John W. SKEELS, Plaintiff,

v.

UNIVERSAL C.I.T. CREDIT CORPO-
RATION, Defendant,

v.

Estelle A. SKEELS, Third-Party
Defendant.

Civ. A. No. 61-219.

United States District Court
W. D. Pennsylvania.

Oct. 2, 1963.

Jacob Frank, Thomas H. Cauley, Pittsburgh, Pa., for plaintiff.

Duff & Doyle, Pittsburgh, Pa., for defendant.

Richard Klaber, Pittsburgh, Pa., for third-party defendant.

WILLSON, District Judge.

In this civil action a twelve day, hard fought jury trial was had. Plaintiff, John W. Skeels, was a franchised Chrysler automobile dealer. Defendant, Universal C.I.T. Credit Corporation, is in the financing business and, says defendant's counsel, the major source of its profit is gained by purchasing from automobile dealers retail time sales contracts relating to automobiles. The jury returned a verdict for the plaintiff in the sum of $55,000.00 for compensatory damages and $50,000.00 representing punitive damages. On the counterclaim the jury awarded defendant the full amount claimed, that is the sum of $48,674.90. By its verdict the jury found that the defendant pre-emptively seized plaintiff's automobiles and other assets which constituted an unlawful conversion of plaintiff's business by the defendant.

Plaintiff had been a recognized Chrysler automobile dealer in Ingomar, a suburb of Pittsburgh, for many years. The controverted issues in the case arose from the occurrences which took place between November 10 and November 29, 1960. Plaintiff had been doing his financing through defendant for some 19 months prior to November of 1960. Before that plaintiff had done its financing through a Pittsburgh bank. Even before that plaintiff did its financing with de-

fendant, and defendant had actively sought the return of plaintiff's business. Plaintiff was selling a million dollar's worth of cars per year and that volume of business was valuable to defendant. When the parties resumed doing business defendant made a capital loan to plaintiff in the sum of $25,000.00 which was payable monthly, and which monthly payments were never in default. Defendant's counsel describes the method of doing business as follows:

> "In the contracts between Plaintiff and Defendant in which Defendant lends capital loan funds and in which it agrees to floor plan automobiles for Plaintiff, Defendant has secured the agreement of Plaintiff to submit to Defendant all retail time sales contracts. The obvious purpose of this is to permit Plaintiff to purchase as many of these contracts as are worthy of purchase. It is an admitted fact in this case that the main source of Defendant's revenue comes from the interest charges on these contracts which are negotiated between the Plaintiff and his retail customers. If Plaintiff and other automobile dealers are not doing business, no such retail contracts can be generated and none would be submitted to Defendant and the main source of its business would evaporate. Thus, Defendant has every motive for maintaining dealers in business and, in fact, its own witnesses, Van Dyke, Williams and Modrak, testified that their main activity is the promotion of new business from automobile dealers. Thus, Defendant has every motive for maintaining Plaintiff and other automobile dealers actively in business. Under these circumstances and known business facts, it would be against all reason to assume that Defendant had any motive for 'putting Plaintiff out of business'."

█ The theory of plaintiff's case was and is that in the Fall of 1960 plaintiff needed refinancing. Considering the volume of business he was doing he was short on work capital. In fact, defendant had recognized this and had suggested refinancing to plaintiff. In the dealings between the parties plaintiff only dealt with the local representative of the defendant. Defendant being a nationwide corporation, its headquarters were in New York and its local agents were not of and by themselves authorized to grant or extend loans; in fact, the local agents' authority was to a considerable extent limited. But on November 10, 1960, Modrak, defendant's local man approved an application for a new loan to plaintiff from the defendant and sent it on through channels to the New York office. What occurred thereafter with respect to the requested loan was the subject of sharp dispute in the trial testimony and other evidence. In the opinion of the Court, plaintiff's testimony on this phase of the case cannot be reconciled with defendant's evidence. The jury was bound to accept plaintiff's testimony and reject defendant's or vice-versa. · As the verdict favored the plaintiff he is entitled to all the inferences which reasonably flow from the evidence. From November 10th to and including the time defendant moved in on plaintiff's business, one must keep in mind that according to plaintiff he was almost daily assured by defendant's representative not that the loan might be or would be approved, but that it had been actually approved and that the check would be forthcoming momentarily. If one keeps that fact in mind in examining the testimony and plaintiff's theory of the case, then it seems to this Court that the jury verdict must stand.

It is uncontroverted that as is usual plaintiff executed and delivered to defendant all the necessary security instruments and that the parties were bound by the terms and provisions of the Uniform Commercial Code of Pennsylvania, 12A Purdon's Pa.Stat.Ann. § 1–101 et seq.

Plaintiff's new cars purchased from Chrysler were paid for by defendant and held under the floor plan. Plaintiff issued to defendant trust certificates covering used cars which plaintiff took in trade on

a new car deal. It is uncontroverted that all the security instruments required plaintiff to pay defendant forthwith from the sale proceeds of a new or used car, the amount due defendant either under the floor plan or under the trust certificates. The evidence showed, however, that the exact terms of the security instruments were not followed. For instance, plaintiff sold a car to the Bell Telephone Company. Such a firm does business on its own terms and pays in thirty days. The parties recognized this and defendant did not require plaintiff to pay that money in accordance with the terms of the security instruments. Other like instances occurred. Very often several days elapsed because of clearances through banks, and in one case a customer of the plaintiff was a clergyman whom he had dealt with for many years and to whom plaintiff extended credit. Defendant did not collect its money until the Clergyman paid the plaintiff for the car and was apparently satisfied with that arrangement.

Early in the morning of November 29, 1960, defendant sent to plaintiff's business place, six or more men and removed all of the new and used cars from plaintiff's establishment and parked them on the nearby streets. Plaintiff's establishment was situated in the Borough of Ingomar, a suburb of Pittsburgh. Defendant's activities that morning caused a traffic tieup, with the police coming to the scene, and in general the public was aware that the defendant finance company had closed down plaintiff's business. Plaintiff's theory of his case was that the defendant, without cause, effectively destroyed his valuable automobile dealership. Defendant, on the other hand, contended that it did only what the security instruments permitted it to do.

Very early in the course of the trial a representative of the defendant in Pittsburgh, a Mr. Craig, testified concerning a report he made to the New York office. The report related to a conference which took place on November 29th, a few hours after defendant had seized all of plaintiff's automobiles. The report to New York was to the effect, "We wanted him to voluntarily give up the franchises so as to make more evident the fact that he quit rather than inferring that we put him out of business." In the report the word "quit" was underscored. (See Plaintiff's Exhibit D 1 and the Transcript at p. 384.) The Court considers that the nub of the law suit was embraced within the language used by Mr. Craig. That was the point that was left to the jury. As the trial judge, I consider that the jury fully understood the issues in the case. It is not contradicted that on the morning of November 29th, a Tuesday, defendant sent in a half-dozen men, more or less, and removed every single automobile out of plaintiff's place of business. Defendant's representatives on that morning said, "We are taking over", "You are out of business", and other similar language. Defendant took over that morning without giving plaintiff any inkling whatsoever of its intentions. In the meantime plaintiff was expecting the proceeds of the loan and although he was in default on several cars he was given no chance whatsoever to arrange other financing. Defendant points out that the paper was on demand and that the money was due forthwith for cars sold. This was conceded by plaintiff, but his counsel points out that the written agreements between the parties, under the Commercial Code, may be explained or supplemented by a course of dealing or usage or by a course of performance. The Code says "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." 12A P.S. § 1–205 (1962 Supp.).

The jury remained out overnight before returning its verdict. It awarded plaintiff $55,000.00 in compensatory damages and $50,000.00 in punitive damages. On defendant's counterclaim it found for the defendant in the sum of $48,674.90. At the trial and now, defendant asserts that under all the evidence defendant can-

not be held liable to plaintiff. Defendant's counsel, in his brief, says with reference to plaintiff's theory of the case:

"His theory apparently was that John Modrak had authority to make a capital loan to him and that Modrak and defendant breached this contract on November 25, 1960."

And defendant further says:

"After Modrak had recommended making a loan in the amount of $25,000 to the division office and the division office had recommended the making of the loan to the New York office, Mr. Joseph Campbell, a vice president of Defendant in New York, reviewed the recommendations and declined to approve them. His action was relaid to Mr. Modrak and was further relaid by Mr. Modrak to Plaintiff."

The foregoing quotation from defendant's brief simply indicates to the Court that defendant's counsel will not face the issue which plaintiff presented and which was left to the jury. Mr. Doyle for the defendant seems to infer that the only basis for plaintiff's case was breach of contract. I do not agree. Ordinarily it seems repetitious to quote a portion of the charge to the jury, but in this case the charge sets forth the matter under discussion as to what evidence the jury was required to accept in order to find for the plaintiff or for the defendant. The Court's charge commencing at p. 1676 says:

"Now, it seems to me that the case, in spite of everything else, the plaintiff's theory of the case has to be based largely on his own testimony that he didn't give up the business, didn't quit the business, but that they took it away from him.

"Now, in that connection, it seems to me as the case unfolded here, it occurred to me a point here, I think it was Mr. Craig said in his report to New York—and this is for the jury; I am not passing on it, but it points up the case—that he had a discussion I think the night of the 29th. Counsel were there and so on, as I recall it, and he made some statement 'We wanted Mr. Skeels to give up his franchises with Chrysler so that it would appear that he quit business rather than we put him out of business,' and that is just about the whole case right there. I mean that is the issue in a nutshell, because if he quit business, if what Modrak said is the correct story, then I don't think the plaintiff could recover, because Modrak and these other fellows testified, and if he turned the keys over and said, 'Here, it is your business,' that's it, that is the end of it, as I see it, so far as the plaintiff's case is concerned.

"But, on the other hand, you see Mr. Skeels tells an entirely different version of that, but those events that took place during that week, those last several days, particularly the last few hours, and as against that now, in support of it, the plaintiff, of course, dwells upon incidents that he says support him.

"For instance, the defendant, without question, would have a right to enforce its obligation. It had security instruments. There is no contention but what they didn't owe in the first instance these monies, and the defendant would have a right to take over that business, to take over the cars and everything else and liquidate it and get its money.

"The issue is whether they did it by strong-arm methods, as I see it, arbitrarily, without sufficient notice or without any notice—they didn't give them any notice, as I understand the evidence, but that is all for you; I'm not binding on that—or if they did it that way, and, in the meantime, it isn't a question now of Modrak and these fellows not having the power to grant the loan. I think it is conceded they don't have the power to grant it, but the point to all that, as I see it, is for the jury, in the first instance, Williams brought the money to him, but Modrak, as

I recall the testimony, the position of the plaintiff is Modrak told them the loan had been granted and the check would be through in a day or two, within a few days, and everything would be all right. He didn't say to him, according to him, now, that the loan hasn't been granted and we want our money. That is the whole crux of the thing. If that took place, then it seems to put Mr. Skeels asleep; he is not aware that he has to go out and raise money, and, of course, the presence of Mr. Reid and what he did and all that sort of thing may support Mr. Skeels and it may not support him.

"Now, unquestionably in the court's mind, and I think it is correct, nobody doubts it, if the man says, 'Here are the keys, you're in business,' he is not harmed any, he is giving voluntarily up, and that is the end of the business, but, according to him, he has a different idea: He was informed that the loan had been granted, not only approved, but granted, and the check would be there momentarily.

"If that was so, then he would have a right to wait from day to day to straighten things up if the money is available to recapitalize it, he paid the $25,000 capital loan down to $12,400, they were going to recapitalize that, the additional money and so on would give him the additional capital that he needed to pay off any cars that were sold out of trust, and you heard all this testimony about the cars that were sold, the number of them, and all that sort of thing.

"Now, members of the jury, the question again, just for illustration only, if he gave it up and quit, that is one thing, but if he didn't, that is the other part of it."

In summary then, and briefly, the jury decided that Modrak lied to the plaintiff with regard to the loan. This lulled plaintiff into a sense of security with respect to any payments to defendant for cars which he had sold. During the several days previous to November 29th the evidence indicated that defendant, through its officers and agents, had determined to move in on plaintiff's business without notice to Skeels. They notified the Chrysler Corporation of the cancellation of defendant's agreements to pay Chrysler for new cars shipped to plaintiff. They demanded "factory credits" Chrysler owed plaintiff. The jury was justified that in other surreptitious ways defendant's employees were secretly preparing for a quick move. For instance, the keys were secured from plaintiff on the eve of the 28th on some pretext so that entry was gained early in the morning of the 29th. That morning under the evidence plaintiff was effectively put out of business. It is simply being unrealistic to argue that when a finance company takes over a dealer's automobiles and notifies the manufacturer that he is cancelling the arrangements that a dealer is anything but finished so far as his franchise and the public are concerned. As the Court sees the case, it is not so much a question of law as it is a question of fact.

DEFENDANT'S MOTION FOR JUDGMENT N.O.V. UNDER RULE 50

■■ This motion must be denied. As indicated above the case was one for the jury's decision. It is to be observed at this point that defendant seeks a judgment relieving it of liability as to the $105,000.00 awarded against it by the jury. It does not, of course, seek to disturb the amount of the counterclaim awarded. It appears advisable that the issues with regard to these amounts be discussed at this point. Plaintiff's award for compensatory damages was $55,000.00. As indicated this covered the value of his business which was destroyed by defendant's conduct. There was evidence that the value of the plaintiff's business as a going concern ran from $53,000.00 to $200,000.00. The jury chose the sum of $55,000.00 in making its award. I believe that the evidence amply supports this amount and that if anything it is low.

The jury awarded $50,000.00 as punitive damages. Having determined the facts in plaintiff's favor under the evidence it seems to the Court that an award for punitive damages was bound to follow. On this phase of the case the Court charged the jury in part at p. 1696 as follows:

"In assessing damages, the trier of the facts can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff the defendant caused or intended to cause and the wealth of the defendant. The purpose of awarding punitive damages or exemplary damages as they are previously called is to punish the person doing the wrongful act and to discourage such person and others from similar conduct in the future. Punitive damages are awarded only for outrageous conduct; that is, for acts done with bad motive or reckless indifference to the interests of others.

"That 'reckless indifference' might be what would happen to a Chrysler dealer if they took over in the manner in which the plaintiff says they did.

"That is the definition of it, and of course you are not bound to award it. You may award it. The sum is up to you."

The charge to the jury on punitive damages was taken practically verbatim from the Restatement of the Law—Torts, Section 908. The law of Pennsylvania seems clear that under the factual situation presented in the instant case punitive damages are allowable. See Stone v. C. I. T. Corporation, 122 Pa.Super. 71, 184 A. 674, 1936; Voltz v. General Motors Acceptance Corporation, 332 Pa. 141, 2 A.2d 697, 1938; Givens v. W. J. Gilmore Drug Company, 337 Pa. 278, 10 A.2d 12, 1940.

Under the facts in this case as shown by all of the evidence the amount of the exemplary damages is regarded as being reasonable and will not be disturbed.

**DEFENDANT'S MOTION TO AMEND THE JUDGMENT TO INCLUDE INTEREST ON THE AMOUNT THE JURY AWARDED ON THE COUNTERCLAIM**

A great deal of oral and documentary testimony was directed to the amount the security instruments showed plaintiff owed defendant, and plaintiff's claim of offset against the amounts due as shown on the face of the paper. Plaintiff at no time denied the amounts due on the face of various instruments held by defendant. He did, however, claim offsets and deductions. These figures came out in the evidence and were argued by counsel to the jury in their summations and it seems to the court that the jury had these figures in mind and came to a reasonable conclusion in its verdicts by awarding plaintiff compensatory damages for the destruction of his business and at the same time it awarded defendant the full amount asserted in its counterclaim as shown under defendant's evidence. The jury was charged as requested by the defendant with respect to the amount due on the counterclaim. Defendant's 39th request for charge was granted. At p. 1691 the jury was charged that they might find for the defendant on the counterclaim, in the sum of $48,674.90, with interest from November 29, 1960. I now think that the instruction in defendant's favor with respect to recovery for losses on sales of new cars and for expenses of selling new and used cars was erroneous. That matter will be mentioned in some detail hereafter.

When the counterclaim verdict came in the jury wrote on the verdict slip a finding for "the plaintiff for the amount asked for". That verdict was molded and the judgment entered for $48,674.90. I think under the circumstances that the Court should have added interest and defendant's motion is that the judgment be amended to include the interest from November 29, 1960. This motion will be granted in part. Defendant's other motions are refused.

## PLAINTIFF'S MOTION FOR A NEW TRIAL

In this motion plaintiff contends the most it owed defendant under the evidence was $22,257.87. The point is that if that is correct then the amount of the counterclaim is reduced and because of a loss item the most that it should be charged against the $55,000.00 verdict is the sum of $16,121.17. In the alternative, says plaintiff, a new trial should be had with regard to the counterclaim.

The amount the jury awarded defendant on the counterclaim was computed as follows:

| | | |
|---|---|---|
| 1. | Capital loan | $12,400.00 |
| 2. | Nine new cars S.O.T. | 25,637.53 |
| 3. | Losses on sales of new cars | 9,378.16 |
| 4. | Expenses of selling new and used cars | 1,259.21 |
| | | $48,674.90 |

The foregoing items were listed on the blackboard by permission of the Court during Mr. Doyle's argument to the jury. These sums represented a maximum amount due by Skeels to the defendant when the affair of the 29th of November was over and the new and used cars had been disposed of by the defendant.

 The last two items on the list, that is the sum of $9,378.16 and the sum of $1,259.21, representing losses on sales of new cars and representing the expenses of selling new and used cars cannot be allowed the defendant because of the provisions of the Commercial Code as interpreted by this Court. The Code seems clear and explicit as pointed out in plaintiff's brief. Section 9–504 of the Code requires that disposition of the collateral may be at public or private sale, but the security owner must give reasonable notification of the time and place of any public or private sale. It is conceded in this case that no notice whatsoever was given to Skeels at the time the cars, new or used, were sold. There was simply no compliance by defendant with this Section of the Commercial Code. Although the statute is clear on this subject and several Pennsylvania Appellate decisions state that notice must be given by the security holder in disposing of the collateral, there seems to be no case in which a security holder has been denied recovery for a so-called loss when notice has not been given. See Atlas Credit Corporation v. Dolbow, 193 Pa.Super. 649, 165 A.2d 704, 1960; and Alliance Discount Corporation v. Shaw, 195 Pa.Super. 601, 171 A.2d 548, 1961. It seems to this Court, however, that to permit recovery by the security holder of a loss in disposing of collateral when no notice has been given, permits a continuation of the evil which the Commercial Code sought to correct. The owner should have an opportunity to bid at the sale. It was the secret disposition of collateral by chattel mortgage owners and others which was an evil which the Code sought to correct. It is important to note in the instant case that there was no waiver of the right to notice on disposition of collateral. A security holder who disposes of collateral without notice denies to the debtor his right of redemption which is provided him in Section 9–506. In my view, it must be held that a security holder who sells without notice may not look to the debtor for any loss. Plaintiff in his Supplemental Requests for Charge and in his Requests for Charge, particularly Nos. 8, 9 and 10, asked for instructions to the jury to that effect. It is now my considered view that binding instructions should have been given with respect to the two items in the counterclaim as mentioned above in the total sum of $10,637.37. The amount of the counterclaim as fixed by the jury, that is the sum of $48,674.90 will be reduced by the sum of $10,637.37, leaving an award on the counterclaim of $38,037.53.

In one further respect the jury disregarded the Court's instructions. The items mentioned here are liquidated amounts. On the counterclaim then the amount due the defendant is the sum of $12,400.00 which is the balance due on the capital loan and the sum of $25,637.53 which is the amount the defendant advanced on the new cars. The jury had to

resolve by its verdict the issue raised by the plaintiff as to any credits or offsets. But the jury having found for the defendant on the two items above, a total sum of $38.037.53, interest follows as a matter of law. See Wilson v. Homestead Valve Manufacturing Company, 3 Cir., 217 F.2d 792, cert. denied 349 U.S. 916, 75 S.Ct. 606, 99 L.Ed. 1250, 1955.

Defendant's motion to amend the judgment and to add interest on the sum of $38,037.53, the net amount of the counterclaim, will be granted. All other motions will be denied.