Richard CIRCO and Margaret
Circo, Plaintiffs,

v.

SPANISH GARDENS FOOD
MANUFACTURING CO.,
INC., Defendant.

No. 83–0125–CV–W–0.

United States District Court,
W.D. Missouri, W.D.

Nov. 21, 1985.

Roland V. Heckman, Kansas City, Mo., for plaintiffs.

Robert B. Thomson, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

ROSS T. ROBERTS, District Judge.

Plaintiffs (Richard and Ola Circo, husband and wife) seek damages and injunctive relief as against defendant (Spanish Gardens Food Manufacturing Co., Inc.), claiming that the latter has: (a) breached an alleged "constructive" partnership agreement between the parties; (b) breached an implied-in-fact contract which alleg-edly existed between the parties; and (c), intentionally and tortiously interferred with alleged contracts between plaintiffs and certain third parties. The matter has been tried to the court.

## I.

### FACTUAL BACKGROUND

Commencing in 1949, one Tom Circo, the father of plaintiff Richard Circo, began selling and delivering food products manufactured by Louis Silva, the owner of the Spanish Garden Taco House. Following the elder Circo's death in 1977, Richard and Ola Circo took over his business, operating under the name "Richard's Delivery Service."

Louis Silva died in 1976. Between that time and July 16, 1981, the Spanish Garden Taco House business was operated by the court-appointed administrator of Silva's estate. The elder Circo, and subsequently the plaintiffs, continued doing business with the administrator. On July 16, 1981, the assets of the Spanish Garden Taco House were purchased by the defendant, a newly formed Kansas corporation. For approximately one year thereafter plaintiffs did business with the defendant, operating in the same way they had with defendant's predecessors.

No written agreement of any sort ever existed as between defendant and the plaintiffs, or between the estate of Louis Silva and Tom Circo or the plaintiffs, or between Louis Silva and Tom Circo. Neither is there any indication of an express verbal agreement or commitment between any combination of those parties. There was, at most, simply a course of dealing carried out over several years, first between Tom Circo and Louis Silva, then between Tom Circo and the administrator of Silva's estate, then between plaintiffs and the administrator, and finally between plaintiffs and defendant.

In that course of dealing, plaintiffs were granted a discount of 15% from the whole-sale price of products manufactured by de-

fendant. Some of those products were sold and delivered to two large grocery warehouses: Associated Grocers, located in Springfield, Missouri, and Affiliated Foods, located in St. Joseph, Missouri. According to the evidence, Associated Grocers would send a purchase order to plaintiff Ola Circo, made out in her name. Plaintiffs would then call or deliver that order to defendant, where the order would be filled. Plaintiffs would thereafter deliver the product to Associated Grocers, with payment being made directly by Associated Grocers to defendant. The arrangement as concerns Affiliated Foods was the same, except that Affiliated placed its orders directly with defendant. Plaintiffs received no cash payment on these transactions; instead, their 15% discount was carried as a credit to their account on defendant's books.

In addition to the above, the plaintiffs serviced some fourteen individual grocery stores (as had the elder Circo before them). Those stores would place orders with the plaintiffs; plaintiffs would buy from defendant—at the 15% discount—the products necessary to fill those orders; and would deliver to the stores. In making such purchases plaintiffs would charge the goods against the sums credited to them in connection with the 15% discount granted on sales to the two warehouses. The grocery stores would pay plaintiffs in cash.

As noted, on July 16, 1981, the assets of the Spanish Garden Taco House business were sold to the present defendant. Thereafter, in July or August, 1981, Richard Circo attended a meeting with representatives of defendant. At that meeting, Circo was told that things were going to change; that defendant could no longer extend a 15% discount on the warehouse sales; and that the discount would have to be reduced. Nonetheless, for approximately a year things continued as before. At some point during that year, however, Circo had a second meeting with defendant's represent-

atives, at which time he was told that defendant intended to begin dealing directly with one or both warehouse accounts. The date—or even time frame—of that second meeting was unstated by any witness and is otherwise incapable of ascertainment. In any event, in July of 1982 defendant did in fact begin dealing directly with both warehouse accounts, and plaintiffs lost that business.

As a result of the latter occurrence, plaintiffs filed this action. Thereafter, in January of 1983, without any prior notification, defendant commenced a refusal to sell any further products at all to the Circos. Plaintiffs claim this action destroyed their ability to continue servicing the fourteen individual grocery stores.

Other facts will be stated as necessary in the discussion of plaintiffs' claims.

## II.

## JURISDICTION AND CHOICE OF LAW

Plaintiffs are citizens and residents of the State of Missouri. Defendant is a Kansas corporation with its principal place of business in Kansas. Diversity jurisdiction exists.

The parties both appear to assume that Kansas substantive law will govern the claims under all three counts of the complaint. There is a basis for that position, and in the circumstances, like the Eighth Circuit in *Lockewill, Inc. v. United States Shoe Corp.*, 547 F.2d 1024, 1026 (8th Cir. 1976), I will accept it, particularly since it appears that Missouri and Kansas law would be identical on all relevant points in any event.[1]

## III.

## DISCUSSION

■ Defendant's motion for judgment on Count I of the complaint, alleging breach

---

1. The potential exception with respect to an application of Kansas law would be in connection with plaintiffs' tortious interference claim. Quite arguably, Missouri law would apply to that claim. *See Inst. Food Marketing v. Golden*

*State Strawberries, infra* at 454 n. 5. However, while Kansas law with respect to tortious interference is less developed than Missouri's, I have no reason to think Kansas law would not follow a similar course of development.

of a "constructive" partnership agreement, was granted at the close of plaintiffs' evidence. That ruling is confirmed here. Briefly stated, the evidence makes clear that plaintiffs did not have, and were not intended by the parties to have, any voice in the management of defendant's affairs in connection with the distribution of its products; that the parties did not share, or intend to share, risks, profits or losses with respect to the distribution of those products; and that the parties did not exercise, or intend to exercise, joint control or ownership of any assets. The necessary indicia of a joint venture or partnership of any kind are thus entirely lacking. *See generally Potts v. Lux*, 161 Kan. 217, 166 P.2d 694, 698 (1946); *Grimm v. Pallesen*, 215 Kan. 660, 527 P.2d 978, 980–82 (1974).

■ Plaintiffs' breach of contract claim (Count II of the Complaint) is also subject to difficulties. First, even if I assume the parties' course of conduct was such as to give rise to an implied-in-fact contract, that contract—being of indefinite duration—was terminable at will. See Kan.Stat.Ann. § 84-2-309(2); *Thompson-Hayward Chemical Company v. Cyprus Mines Corporation*, 8 Kan.App.2d 487, 660 P.2d 973, 974 (1983); and *cf. Landess v. Borden, Inc.*, 667 F.2d 628, 631 (7th Cir.1981); *Lockewill, Inc. v. United States Shoe Corp., supra* at 1028–29. It is true, as plaintiffs note, that under both the common law and § 2–309 of the Uniform Commercial Code (adopted in Kansas and Missouri), termination of such a contract would nonetheless require "reasonable notification" by the terminating party. Uniform Commercial Code Comments 7. and 8.; *Lockewill, Inc. v. United States Steel Corp., supra; Leibel v. Raynor Mfg. Co.*, 571 S.W.2d 640, 642 (Ky.App.1978); *Reisman And Sons v. Snyder's Potato Chips*, 20 UCC Rep. 856, 861 (Pa.Ct.Comm.Pl.1976) (termination at will does not mean termination without notice). It is also true, however, that no particular form of notification is required, *Lockewill, Inc. v. United States Shoe Corp., supra* at 1030; and at least with respect to the warehouse accounts it would seem that the conversation between the parties in July or August of 1981—almost one year prior to the actual termination of the arrangement as to those accounts—was more than sufficient to give plaintiffs actual notice that changes would be forthcoming. *Compare Lockewill, Inc. v. United States Shoe Corp., supra*. Further, and in that same connection, it is undisputed that at some later point in 1981 or 1982, defendant gave Richard Circo specific verbal notification that it would begin dealing directly with those two warehouse accounts. Precisely when that conversation occurred is unknown, but it is clear that it preceded the implementation of any change. In those circumstances, the lack of further specific information creates a fatal gap in plaintiffs' proof. In other words, it is a part of plaintiffs' burden of proof in a claim of this sort to establish either that no prior notification at all was given, or that prior notification was not given a "reasonable" time before termination. The record here demonstrates that specific prior notification in fact was given, but fails to indicate when. I am hardly in a position, under that proof, to hold that the notice period was unreasonably short.

■ Second, and of even more importance since it relates both to the warehouse accounts and to the individual grocery store accounts, there is a failure of proof with respect to the fact of damage (injury). While some uncertainty as to the *amount* of damages is allowable, the *fact* of damage must be proved to a reasonable certainty and cannot be founded upon mere speculation. *Havens Steel Co. v. Randolph Engineering Co.*, 613 F.Supp. 514, 537 (W.D. Mo.1985). In this regard, the basic premise underlying the "reasonable notification" requirement of U.C.C. § 2–309 must be kept clearly in mind. As Comment 8. to that section states, the theory is to "give the other party reasonable time to seek a substitute arrangement." Proof of injury, then, would necessarily require at least a showing (or permissible inference) that plaintiffs were, because of the lack of adequate prior notice, unable to procure a "substitute arrangement"—here, an alter-

nate source of supply for products of the same nature as those sold by defendant[2]—in time to avoid damage.[3] To hold otherwise would be to allow damages which flow not from the lack of notice, but rather simply from the termination itself; something inapposite to the legal basis of the claim. *City Builders Supply Co. v. National Gypsum Co.*, 39 UCC Rep. 826, 831–32 (D.Mass.1984) [Available on WEST-LAW, DCTU database]. In the present case there is no proof concerning whether alternate sources of supply were available,[4] how much time would have been involved in implementing any such alternate sources, or what plaintiffs' efforts in those connections might have been. In fact, the only evidence even touching the point is that plaintiffs had always been free to buy or distribute the products of other manufacturers, and indeed had done so. Whether any of those products were substitutable for defendants' products, and were readily available, is unknown; but that certainly does not translate into affirmative evidence which supports a finding of injury.

Plaintiffs' tortious interference claims (Count III of the complaint) must also be denied. Neither as to the warehouse accounts, nor as to the fourteen grocery stores, is there any legal impropriety in any action defendant took.

■ Analytically, the tortious interference claim concerning the warehouse accounts is governed generally by the principles set forth in § 766 of the Restatement (Second) of Torts;[5] plaintiffs' theory being, apparently, that by prevailing upon the warehouses to deal directly with it, defendant caused them to breach implied-in-fact, terminable at will contracts with the plaintiffs. In moving to create a direct marketing relationship with those two accounts, however, defendant was acting in competition with the plaintiffs; and under the principles outlined in § 768 of the Restatement its conduct was clearly not improper. That is, no wrongful means were employed; the acts did not constitute any sort of unlawful restraint of trade; and defendant's purpose was at least in part to advance its own legitimate business interests in the distribution of its goods. *See* Restatement (Second) of Torts § 768(1) (1979); *Cesnik v. Chrysler Corp.*, 490 F.Supp. 859, 870–74 (M.D.Tenn.1980); *Mardirosian v. American Institute of Architects*, 474 F.Supp. 628, 650–51 (D.D.C.1979); *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn.1982); *Ron Tonkin Gran Turismo v. Wakehouse Motors*, 46 Or.App. 199, 611

---

**2.** Although different sorts of injury can be involved in these kinds of cases—specifically in accumulated inventory and recoupment of investment situations—the potential injury here is limited to that described, since there was no accumulated inventory to be disposed of, and since there is absolutely no evidence of any investment which plaintiffs should be entitled to recoup. As to the latter point, *see Lockewill, Inc. v. United States Steel Corp., supra* at 1029–30.

**3.** And, of course, the *amount* of damage (in the present sort of claim) would necessarily be limited to that incurred during the time span of what would have been a "reasonable notification" period, together with any further injury consequential to that damage, rather than simply extending *ad infinitum* into the future as plaintiffs appear to suggest.

**4.** If there was no alternate source of supply available—i.e., if defendant was the only manufacturer of the type or quality of product in question—then there could be no injury at all, since lack of prior notification would make no difference. That is, in those circumstances plaintiffs' situation (in the present sort of case) would be the same whether or not prior notice was given.

**5.** The treatment accorded this general topic by the Restatement of Torts, both First and Second, has been criticized by several writers as over-expansive and ill-conceived, see, e.g., Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark.L.Rev. 335, 345–46 (1980); Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Theory*, 49 U. of Chi.L.Rev. 61 (1982) (throughout), although not necessarily for the same reasons. Indeed, the drafters of the Restatement (Second) appear to have had considerable difficulty with the subject, with widely divergent views on some aspects of it. *See, e.g.,* Perlman, *supra* at 64 n. 16, 65 n. 19. I believe the Missouri and Kansas courts would agree with some of those criticisms (as do I), and I make use of the Restatement as authority here only to the extent I believe those courts would accept the principles set forth therein.

P.2d 658, 664 (1980). In fact, the circumstances here seem to fall squarely within the Eighth Circuit's holding in *Inst. Food Marketing v. Golden State Strawberries,* 747 F.2d 448 (8th Cir.1984), to the effect that one who has an economic interest in a contract—which was assuredly the case with defendant here, since its products were the subject of those contracts (assuming, for this purpose, their existence) and since it had always operated in at least a partial direct relationship with the warehouses in connection with those contracts—cannot be held liable for inducing a breach of that contract, even though motivated by self-interest, in the absence of pleading and proof that the action was accomplished by some improper means. *Id.* at 454.

■ The claim with respect to the individual grocery stores is perhaps more troublesome, but I believe the same result must obtain. Since plaintiffs' apparent theory is that defendant's January, 1983 refusal to continue the 15% discount on any sales to plaintiffs, or to make any sales of any sort to plaintiffs, interfered with plaintiffs' claimed implied-in-fact, terminable at will contracts with those grocery stores (by preventing plaintiffs' performance under those contracts or by making the performance more burdensome or expensive), Restatement (Second) § 766A, rather than § 766, would apply. Defendant's own relationship with plaintiffs, however, involved at most a contract terminable at will, and its actions accordingly represent no more than a mere unilateral refusal to deal. While § 766 and § 766A might both be read as suggesting that the presence of an improper motive can create liability even in those circumstances, *see* § 766, Comment *l* ; § 766A, Comment *g* (referencing § 766, Comment *l* ), I do not believe liability can or should be imposed on that basis, and—more importantly—do not believe the courts of either Kansas or Missouri would so impose it. I

note, in that respect, that any such rule would fly squarely in the face of the underlying concept of a contract terminable "at will;" instead of being terminable for any reason or no reason, such a contract would become terminable (at least without the risk of tort liability) only if the terminating party's motive and purpose was pure. In that regard, *see Pillow v. General American Life Ins. Co.,* 564 S.W.2d 276, 281 (Mo.App.1978), holding that a tortious interference claim cannot be predicated upon an act which involves no more than the exercise of an otherwise absolute legal right. The result becomes even more incongruous in view of the fact that punitive damages could also attach.[6] In addition, I note that the original Restatement, see Restatement (First) of Torts, § 762 (1939), specifically provided that a mere refusal to deal was *not* to be taken as a basis for tortious interference liability, regardless of motive, *see* Comment *c,* in the absence of circumstances which (in effect) make the conduct otherwise wrongful. As Comment *a* to that section pointed out:

> The rule stated in this Section rests upon fundamental assumptions in free business enterprise. Each business enterprise must be free to select its business relations in its own interest.... Denial of this privilege to select business relations would intefere, it is thought, with an important factor in the competitive process and might defeat its aim....

Despite the apparent suggestion of the Restatement (Second)—for which I can find no case authority—the courts continue to apply the rule quoted above. See, *e.g., Fulton v. Hecht,* 580 F.2d 1243, 1250–51 (5th Cir.1978), *reh. denied,* 585 F.2d 520, *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979); *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910, 914 (8th Cir.1976); *Rothermel v. International Paper Co.,* 163 N.J.Super. 235, 394

---

**6.** In fact, it is arguable that even a defendant's actual breach of a contract with the plaintiff cannot give rise to a tortious interference claim, by *that plaintiff* in connection with other contracts between the plaintiff and third persons, no matter what the defendant's motive, intent or

purpose, since the ultimate effect of such a theory would be (among other things) to permit a recovery of punitive damages on an otherwise ordinary breach of contract claim. *See Canister Co. v. National Can Corp.,* 96 F.Supp. 273, 274 (D.Del.1951); and *see generally* Perlman, *supra.*

A.2d 860, 864–67 (1978); *Levin v. Kuhn Loeb & Co.*, 174 N.J.Super. 560, 417 A.2d 79, 86–8 (1980). The Missouri Supreme Court has accepted that rule, *International Plastics Development, Inc. v. Monsanto Company*, 433 S.W.2d 291, 297–98 (Mo. 1968); *Giloti v. Hamm-Singer Corp.*, 396 S.W.2d 711, 713–14 (Mo.1965), and I have no reason to believe the Kansas courts would not do likewise. I hold, accordingly, that a defendant's mere unilateral refusal to deal (or, under a contract terminable at will, to continue to deal), which violates neither the anti-trust laws, *see United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468 (1919), nor otherwise amounts to an independent wrong, is simply not actionable as a tortious interference with respect to contracts between the refused party and others, no matter what the defendant's motive, purpose or intent may have been.[7]

Based upon all of the foregoing, it is

ORDERED that defendant shall have judgment on each of plaintiffs' claims, and that each of those claims should be and is hereby dismissed with prejudice; and it is further

ORDERED that defendant shall have and recover its taxable costs herein incurred and expended.

---

[7] Although unnecessary to the decision as I have reached it, I note that defendant's refusal of any further dealing with plaintiffs was not, as plaintiffs appear to suggest, motivated entirely by a desire to retaliate for plaintiffs' initiation of this suit, much less by any articulated, actual desire (as such) to disrupt plaintiffs' dealings with the grocery stores. The evidence establishes, to the contrary, that defendant's action followed and was in partial response to plaintiff Richard Circo's admitted threat to "break the legs" of one of defendant's officers if that person did not stop calling Circo.