Argued and submitted June 16, resubmitted In Banc December 8, 1993, reversed and remanded in part; otherwise affirmed April 20, Uptown Heights' petition for review and Seafirst Corporation's petition for review allowed July 19, 1994 (319 Or 406)

# UPTOWN HEIGHTS ASSOCIATES LIMITED PARTNERSHIP,
a Washington limited partnership,
Leavitt, Shay (Uptown), Inc.,
a Washington corporation,
and Leavitt, Shay & Company, Inc.,
a Washington corporation,
*Appellants,*

*v.*

# SEAFIRST CORPORATION,
a Washington corporation
and registered bank holding company,
and Seattle-First National Bank,
a national banking association,
*Respondents.*

(9203-02042; CA A75880)

873 P2d 438

Jacob Tanzer argued the cause for appellants. With him on the briefs were Mark L. Cushing, Rochelle Lessner and Ball, Janik & Novack.

Rodney E. Lewis, Jr., argued the cause for respondents. With him on the brief were John F. McGrory, Jr., and Davis Wright Tremaine.

DEITS, J.

Riggs, J., concurring in part; dissenting in part.

Edmonds, J., concurring in part; dissenting in part.

## DEITS, J.

Plaintiffs appeal the dismissal for failure to state claims of their action for contractual and tortious breach of the duty of good faith and fair dealing and for wrongful interference with contractual and business relationships. ORCP 21A(8). We affirm in part and reverse in part.

We take the facts as alleged by plaintiffs, together with the reasonable inferences that may be drawn from them. In June, 1989, plaintiffs entered into a multimillion dollar construction loan agreement with defendant Seafirst Corporation (Seafirst), a Washington bank holding company.[1] The loan was made principally to finance plaintiffs' joint project to construct the Uptown Heights (Uptown) apartments in Portland. Seafirst was plaintiffs' principal bank and lender, and plaintiffs were prominent and longstanding customers of Seafirst's. During the relationship, Seafirst had always worked closely with plaintiffs' principal, conducted business in an informal manner, treated him as a special customer, and had not strictly enforced its rights.

Seafirst solicited plaintiffs' business for the financing of Uptown. The loan was secured by a deed of trust on the land and buildings at the apartment project. As part of the loan process, plaintiffs obtained an appraisal of $10,250,000 from a third-party appraiser recommended and approved by Seafirst. Seafirst also independently evaluated the project and updated the appraisal during construction to $10,400,000. The principal amount of the loan was due January 1, 1991, with a provision for two six-month extensions until January, 1992.

Shortly after construction of the apartments was completed, the market for their rental changed considerably from the pre-construction forecast. Plaintiffs recognized in the early fall of 1990 that there would be short-term cash flow problems in paying the required monthly interest payments on the loan. They discussed that problem with Seafirst personnel. Plaintiffs stayed current with the loan payments, and in October, 1990, Seafirst granted plaintiffs the first six-

---

[1] According to the complaint, defendant Seattle-First National Bank acted as Seafirst's agent in connection with the events. The roles of the two defendants were interconnected and our references to "Seafirst" include both.

month extension. Seafirst told plaintiffs that it would continue to work with them on loan extensions.

In April, 1991, plaintiffs were unable to make their full interest payment. Plaintiffs and Seafirst continued to negotiate about how to resolve the situation. Plaintiffs had already relinquished their developer's fee of approximately $350,000 and further invested $450,000 of additional funds. Seafirst ordered an additional appraisal, which was $8,850,000 or approximately $1 million over the outstanding loan balance of $7.8 million.

Plaintiffs' business had always been conducted through Seafirst's "Private Banking" department for preferred, large customers and, after a bank reorganization, through the real estate department. Plaintiffs were continually assured by personnel in these departments that Seafirst would work with them to solve any problems on the Uptown project. Nevertheless, in June, 1991, Seafirst did not grant the second six-month loan extension. It transferred the Uptown loan and all of plaintiffs' other business to its problem department, "Special Credits," even though no other accounts were in trouble or at risk. It also refused to loan money for an unrelated joint venture project unless plaintiffs were removed as a participant. Seafirst began to threaten plaintiffs with foreclosure of the Uptown project.

Due to the pressure from Seafirst and concerns about their business reputation, plaintiffs decided to find a buyer for Uptown. Plaintiffs asked Seafirst not to bring a foreclosure action before a sale, because it would endanger the sale and plaintiffs' additional investment. Plaintiffs explained that they were concerned that the buyer would wait to buy the property at a bargain price after the foreclosure. Two days after plaintiffs notified Seafirst of an offer, Seafirst initiated a foreclosure action and filed a complaint for the appointment of a receiver. Before the hearing on the receivership, plaintiffs provided Seafirst with details of the purchase offer for Uptown. Seafirst refused to postpone the hearing to permit further negotiations with the buyer. The buyer withdrew the offer.

Subsequently, plaintiffs received another offer for $8.6 million. They notified Seafirst of that offer and asked it

not to proceed with the foreclosure. However, Seafirst continued with the foreclosure sale. It purchased the property for the amount of the loan due, $7.8 million, and immediately resold it for the same amount. Plaintiffs received nothing for the sale and lost all their equity. They brought this action against Seafirst, which was dismissed for failure to state facts sufficient to constitute a claim.

▮ Plaintiffs first assign error to the dismissal of their claim against Seafirst for breach of the implied contractual duty of good faith and fair dealing by foreclosing before plaintiffs could sell Uptown. Seafirst argues that plaintiffs have no right to claim breach of the implied duty, because plaintiffs defaulted on the interest payment, and the remedies that Seafirst pursued are specifically permitted by the parties' contract in the event of such a default.[2]

Plaintiffs respond that Seafirst had discretion as to whether it would pursue the foreclosure remedy provided by the contract and, therefore, it was required to act in good faith in exercising that discretion. Plaintiffs rely on *Best v. U. S. National Bank*, 303 Or 557, 563, 739 P2d 557 (1987), where the court said:

> "When one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that the discretion will be exercised for particular purposes. If the discretion is exercised for purposes not contemplated by the parties, the party exercising discretion has performed in bad faith."

Plaintiffs conclude:

> "Here, the purpose of Seafirst's power to foreclose was to secure its loan. Because the property's value was well in excess of the loan balance, however, a jury may infer that Seafirst acted for some other purpose not consistent with the parties' expectations when they agreed that Seafirst would have this power."

Seafirst answers that its right to foreclose was an express term of the contract and, as such, the implied duty of good faith and fair dealing has no application to its exercise.

---

[2] Although the terms of the contract are not fully spelled out in the complaint, the parties agree that the remedies that Seafirst pursued are expressly provided for in the contract.

Seafirst relies principally on *Badgett v. Security State Bank*, 116 Wash 2d 563, 807 P2d 356 (1991), where the Washington court so reasoned in rejecting the contention that the implied duty arose in connection with loan extension negotiations between a bank and its customer.[3] However, we believe that there is Oregon authority that is on point and that supports Seafirst's argument. In *Sheets v. Knight*, 308 Or 220, 779 P2d 1000 (1989), the court held that a party's invocation of the power to terminate an at-will employment contract could not violate the implied duty of good faith and fair dealing, because

"[t]he foundation of the at-will employment agreement is the express or implied understanding that either party may terminate the contract for any reason, even for a bad cause. A duty of good faith and fair dealing is appropriate in matters pertaining to on-going performance of at-will employment agreements. It is not appropriate to imply the duty if it is inconsistent with a provision of the contract." 308 Or at 233.

The court, therefore, concluded that an express unilateral right to terminate is not subject to the implied duty of good faith.

In *Harris v. Griffin*, 109 Or App 253, 258, 818 P2d 1289 (1991), we applied *Sheets* in a case involving a real property seller's right to invoke a contractual default remedy, and said:

"Assuming, without deciding, that the implied duty of good faith and fair dealing can have any application in connection with a seller's exercise of an express contractual right to declare a default and accelerate, *but see Sheets v. Knight*, 308 Or 220, 779 P2d 1000 (1989); *Tolbert v. First National Bank*, 96 Or App 398, 772 P2d 1373 (1989), [*aff'd in part, rev'd in part*, 312 Or 485, 823 P2d 965 (1991)], the specific points that defendants make to support their argument show nothing except that plaintiffs exercised that right under circumstances that entitled them to do so, but which defendants think called for forebearance [*sic*]. In other words, defendants maintain, plaintiffs breached the implied duty by doing exactly what the contract expressly permitted them to do. As the court said in *Sheets v. Knight, supra*, 308 Or at 233, 'It is not appropriate to imply the duty if it is inconsistent with a provision of the contract.' We reject the argument."

---

[3] Seafirst also relies on *Tolbert v. First National Bank*, 312 Or 485, 823 P2d 965 (1991). We do not consider that case to be of decisive significance here.

The same reasoning applies equally to a lender's invocation of remedies that the parties' contract expressly allows in the event of a borrower's default.

The underlying flaw in plaintiffs' argument is their supposition that Seafirst's act was "discretionary," in the sense that that word is used in *Best v. U. S. National Bank, supra,* and similar cases. As used there, the word refers to the establishment of conditions in the performance of ongoing contracts by a party on whom the contract confers the unilateral authority to specify those conditions in accordance with the interests or expectations of both parties. As *Sheets* and *Harris* make clear, neither "discretion" specifically nor the rationale for the implied good faith doctrine generally has any relevance to a party's election to pursue a remedy that the contract expressly gives that party for the party's sole benefit, and the pursuit of which effectively ends the contractual relationship. It is true that Seafirst had discretion, in the sense that the contract did not require it to foreclose. However, that is not the kind of discretion that *Best* and its progeny envision, and it does not alter the fact that Seafirst had the contractual right to do what it did and breached no implied contractual duty by doing so. The contract claim was properly dismissed.

Plaintiffs next assign error to the dismissal of their tort claim based on a breach of the duty of good faith. They note that they pleaded the existence of a "special relationship" between Seafirst and themselves, as borrower and lender. Assuming that that can constitute a special relationship, for purposes of the tort claim, *see Georgetown Realty v. The Home Ins. Co.,* 313 Or 97, 831 P2d 7 (1992), the pleaded facts show no breach of the duty as a matter of law. Plaintiffs rely on *Harper v. Interstate Brewery Co.,* 168 Or 26, 120 P2d 757 (1942), which they characterize as standing for the proposition that "a secured lender/borrower relationship can impose an extra contractual standard of duty upon a lender in choosing its remedies." However, we read *Harper* as stating a much narrower proposition. In *Cascade Steel Fabricators v. Citizens Bank of Oregon,* 46 Or App 573, 612 P2d 332, *rev den* 298 Or 741 (1980), we explained *Harper* and discussed the availability of the tort theory that plaintiffs seek to allege. The plaintiff in *Cascade* brought a tort action for bad faith,

asserting that the defendant bank's conduct in demanding payment of a loan and foreclosing on the collateral was tortious, in the light of the parties' long history of dealing and the alleged prediction by a bank representative "that further financing would be forthcoming." We said:

"Plaintiff cites two cases to support its tort theory of bad faith: *Harper v. Interstate Brewery Co.*, 168 Or 26, 120 P2d 757 (1942), and *Skeels v. Universal C.I.T. Credit Corporation*, 222 F Supp 696 (WD Penn), *judgment vacated on other grounds* 335 F2d 846 (3d Cir 1964). In *Harper* the Supreme Court held that a deed given to secure an indebtedness was, in effect, a mortgage, and that a right given to the mortgagee to sell the property at a private sale required the mortgagee to use good faith to secure the best possible price on the sale. The court's holding was specifically directed to the manner in which the mortgagee had exercised its power of sale, which bears no relationship to the facts and the issue in the present case.

"In *Skeels* the plaintiff, an automobile dealer, brought an action against the defendant, a credit and financing agency, for failure to provide additional financing. A representative of defendant, knowing that plaintiff's request for an additional $15,000 loan had been denied by the home office, repeatedly assured plaintiff that the loan was forthcoming and that plaintiff could act accordingly, including paying its accounts payable. Thereafter, plaintiff became delinquent in its obligation to the defendant financing agency and the agency took possession of all of plaintiff's inventory. The decision of the Court of Appeals described defendant's actions in assuring plaintiff that he would receive the loan when it knew that loan had been rejected as a 'willful wrong.' 335 F2d at 849.

"Unlike *Skeels*, in the case at bar the plaintiff was not falsely advised that the additional financing was forthcoming and encouraged to act on that advice. Optimism may have caused plaintiff to believe it was going to receive additional financing, but that was not what it was told by the bank. On the contrary, the bank representative told plaintiff he did not see any problem but that he would have to consult with his superiors, which would take a few days. The 'willful wrong' that existed in *Skeels* is not present here and no tort was committed against plaintiff. If we accept plaintiff's position, then a bank could be liable to anyone merely by indicating that a loan appeared to be favorable, saying that time was needed to consider it, and then refusing the additional

financing and foreclosing on its collateral." 46 Or App at 576-77. (Footnote omitted.)

In this case, similarly, plaintiffs' allegations, viewed as favorably as possible to them, show nothing approximating the willful misconduct that the court described in *Skeels v. Universal C.I.T. Credit Corporation, supra.* As in *Cascade Steel Fabricators,* to hold that Seafirst's conduct was tortious or violated an implied good faith duty here would make any default remedies unavailable to a lender that had offered assistance or expressed encouragement to the borrower before pursuing the contractual remedies.

We do not suggest that we condone the course of dealing in which plaintiffs allege that Seafirst engaged. If the issue were whether Seafirst's conduct estops it from pursuing the contractual remedy, we *might* agree that there is enough alleged here to get plaintiffs past the pleading stage. However, that is not the argument that plaintiffs make. Rather, they contend that the express remedy under the contract is subject to the implied duty. That contention is at odds with *Sheets v. Knight, supra,* and *Harris v. Griffin, supra.* Both the contract and tort good faith claims were correctly dismissed.

In their remaining assignments, plaintiffs contend that the court erred by dismissing their third, fourth and fifth claims, in which they alleged that Seafirst interfered with their business and contractual relationships with the prospective buyer of Uptown and the prospective participant in the unrelated joint venture. We agree that it was error to dismiss those claims. Interference with contractual relations or future business relations is actionable if the defendant acts with the improper objective of harming the plaintiff or uses wrongful means that in fact cause injury to the plaintiff's contractual or business relationships. *Top Service Body Shop v. Allstate Ins. Co.,* 283 Or 201, 205, 582 P2d 1365 (1978). Moreover, as we explained in *Hickman Construction v. South Umpqua State Bank,* 109 Or App 527, 532, 820 P2d 838 (1991):

"[A] plaintiff's burden in an intentional interference action is not to negate every possible proper basis for the defendant's actions. All that is necessary to prove improper means or motive is evidence of *an* improper means or motive that

the jury can believe was *the* reason for the action." (Emphasis in original.)

The intent element of an interference claim is either an actual intent to cause the harm or acting with knowledge that the "interference is substantially certain to occur from [the] action or is a necessary consequence thereof." *Straube v. Larson*, 287 Or 357, 361, 600 P2d 371 (1979). The plaintiff must allege some injury, and the interference must be wrongful beyond the fact of the interference.

■    Here, plaintiffs pleaded that they informed Seafirst of the offer that they received to buy Uptown for between $300,000 to $800,000 more than the outstanding debt, which would have allowed them to recoup a substantial portion of their investment. They asked Seafirst not to appoint a receiver or foreclose in order to allow the sale of Uptown to proceed. Because Seafirst went forward with the receivership and foreclosure, plaintiffs lost the sale and, subsequently, all their equity in Uptown. Plaintiffs have alleged sufficient facts to support an inference that Seafirst acted without a proper business purpose and with the improper objective of harming plaintiffs. Plaintiffs also pleaded that, acting with an intent to injure them, Seafirst made funding on the unrelated project contingent on plaintiffs being removed as partners. Their pleadings of the three interference claims meet the minimum requirements necessary to survive a motion to dismiss.

Some response to Judge Edmonds' dissent is necessary. He would hold that the third, fourth and fifth claims were properly dismissed. The critical step in his reasoning is that liability for intentional interference by one acting with a privilege — which he postulates Seafirst was — may arise if the defendant employed improper means, but not if the theory of liability is that the defendant acted with an improper motive. We do not agree that the pertinent Oregon case law permits that distinction or permits the conclusion that a defendant's improper motive cannot result in liability for an intentional interference tort arising out of privileged conduct.

In *Ramirez v. Selles*, 308 Or 609, 612, 784 P2d 433 (1989), the Supreme Court reversed our holding that an intentional interference claim had been properly dismissed

under ORCP 21A(8). *See* 96 Or App 340, 772 P2d 952 (1989). The Supreme Court said:

> "The Court of Appeals then continued with this statement:
>
> " 'Because plaintiff alleges facts showing that defendants are business competitors of plaintiff, plaintiff must also allege facts showing that they were not privileged to interfere with the relationship between plaintiff and his clients.'
>
> "96 Or App at 343. The court found no allegations by plaintiff that adequately negated defendants' privilege to advance their own interests by competing with plaintiff. The legal question therefore is whether defendants must allege facts that bring their conduct within the privilege of competitors to interfere with another's contract or whether a complaint that on its face shows defendants' status as competitors must also allege facts to negate the privilege.
>
> "The Court of Appeals cited *North Pacific Lbr. v. Moore*, 275 Or 359, 369, 551 P2d 431 (1976), where this court stated that the plaintiff 'was required to prove that [defendant] purposely caused a third person not to continue a business relation with plaintiff and that [defendant] was not privileged to do so.' *Subsequently, this court held that once the complaint alleges an intentional interference with a contractual relationship for an improper motive or by improper means, a defendant's privilege is a matter of defense and the absence of privilege is not a part of plaintiff's affirmative case.* 'No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant.' *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 582 P2d 1365 (1978). A defendant therefore can obtain dismissal of a complaint that does not allege the necessary factual elements of the tort by an unprivileged defendant. But what if facts giving rise to a potential privilege, here the privilege of business competition, appear on the face of the complaint? *Top Service Body Shop* continued: '*Even a recognized privilege may be overcome when the means used by defendant are not justified by the reason for recognizing the privilege.*' 283 Or at 210. The defense of a competitor's privilege depends on remaining 'within the reason for recognizing the privilege.' " (Emphasis supplied.)[4]

---

[4] For purposes of this opinion, we accept Judge Edmonds' understanding that *Ramirez* holds that a complaint that shows the existence of a privilege on its face, but

■      Judge Edmonds appears to read the second emphasized passage in the quotation as either leaving open or resolving negatively the question of whether an improper motive, like the improper means mentioned in the passage, can overcome a privilege. For two reasons, we disagree. First, his reading is not consistent with the first of the emphasized passages. That passage says that an allegation of an improper motive *or* improper means by the plaintiff suffices to state the claim and to make the question of privilege one of defense. It follows, when the two passages are read together and as being consistent with each other, that improper motives *and* improper means bear the same relationship to the issue of privilege, *i.e., either* can overcome a privilege.

Second, the later passage in *Ramirez* is a quotation from *Top Service Body Shop v. Allstate Ins. Co., supra.* Although the passage itself does not refer to "improper motives," the five pages of the *Top Service Body Shop* opinion that follow the passage are devoted to the questions of whether there was evidence that the privileged defendant had acted with an improper motive, and whether the defendant acted only within its privilege. Having answered the first question in the negative and the second affirmatively, the court went on to summarily reject the plaintiff's "alternative theory of tortious interference by improper means," 283 Or at 215, because that theory had not been submitted to the jury and the plaintiff did not assign error to the trial court's refusal to instruct the jury on it. We do not think that it is reasonable to read a brief selective passage from *Top Service Body Shop* as suggesting that only improper means can overcome a privilege, or that improper motives cannot, when the intentional interference issue in the case that the court discussed at length was an improper motive theory and when no question of improper means had been preserved.

Moreover, in *Top Service Body Shop* and the subsequent intentional interference cases decided by the Supreme Court and this court, the phrases "improper motives" and "improper means" are uniformly used in tandem in the

does not "negate" the privilege, is subject to dismissal. However, the Supreme Court's opinion is not completely clear on that point. Our concern is not with that aspect of *Ramirez*, but with whether improper motives, as well as improper means, can suffice to negate the alleged privilege.

general descriptions of the law. There is no basis in the case law for concluding that the two play a different role, or that the role of only one of them changes, when the context changes from unprivileged to privileged conduct. Especially noteworthy in that regard is *Welch v. Bancorp Management Services*, 296 Or 208, 675 P2d 172 (1983), *modified* 296 Or 713, 679 P2d 866 (1984). There, in discussing the privilege of advisors, employees and agents acting on behalf of their principals, which is possibly the most protected of all of the privileges in the law of intentional interference torts, the court made clear that both improper motives and improper means could serve as grounds for the intentional interference claim, *see* 296 Or at 715-16, and it expressly defined the nature of the improper motive that could overcome that particular privilege ("acts against the best interests of the principal or acts solely for [the agent's] own benefit"). 296 Or at 216-19. There would have been no occasion to discuss or define the improper motive if it could have had no legal effect on the defense of privilege that was undisputably present in *Welch*.

Because we read the Supreme Court's decisions to have decided the question differently from the way Judge Edmonds would, it is not necessary to say a great deal about the rationale that leads him to conclude that improper motives cannot overcome privileges, while improper means can. Judge Edmonds states that "[t]here is no public policy reason to provide a defendant with tort immunity when he acts with improper means." 127 Or App at 376. However, we are unaware of any public policy that favors improper motives and we do not understand why improper motives, such as an intentional design to injure another, should be less redressable than improper means.[5]

---

[5] Judge Edmonds states that we misread his opinion as suggesting that improper motives are irrelevant to *any* privileged conduct, when his view is that the "materiality of an improper motive will depend on the particular privilege involved." 127 Or App at 375. However, his opinion offers no persuasive reason why this particular privilege should be more insulated from redress than others or why it or any other privilege should be absolutely protected from "improper motives" but not "improper means" claims. The dissent's reasoning is difficult to reconcile with *Welch v. Bancorp Management Services, supra,* where the court effectively held that *any* proper motivation on the part of an employee or agent acting for a principal is sufficient to defeat liability, however much bad motivation might also be involved. *See* 296 Or at 218. Even in that highly insulated setting, the court declined to go as far as to hold that the privilege was an absolute defense to a claim based on improper

The other issues in Judge Edmonds' dissent that call for comment are his alternative arguments that the dismissal of the intentional interference claims should be sustained because the pleadings are conclusory or otherwise technically defective. We do not agree that the trial court's rulings can be upheld on those grounds. *See Hendgen v. Forest Grove Community Hospital*, 98 Or App 675, 678, 780 P2d 779 (1989). We also do not agree that this case is analogous to *Conklin v. Karban Rock, Inc.*, 94 Or App 593, 767 P2d 444 (1989). The decisive principle in the part of that opinion on which Judge Edmonds relies was that, as pleaded, the purported improper motive was incidental to and a part of conduct that was itself properly motivated. Here, the claims allege that Seafirst's *motives* were to injure plaintiffs and their interests, quite apart from the alleged *conduct* itself.

Reversed and remanded on third, fourth and fifth claims; otherwise affirmed.

**RIGGS, J.,** concurring in part; dissenting in part.

I agree with the majority's reasoning and conclusion that it was error for the trial court to grant the motions to dismiss the interference with contractual and business relationship claims. However, I would hold that the contractual and tortious good faith and fair dealing claims were improperly dismissed, and I dissent from the part of the majority opinion that affirms those rulings.

For its conclusion that the duty of good faith and fair dealing does not apply to a lender's right to invoke a contractual default remedy, the majority opinion relies on two opinions which expressly declined to address the issue for which they are now cited. Furthermore, the majority opinion conflicts with *Best v. U.S. National Bank*, 303 Or 557, 564, 739 P2d 554 (1987).

*Best* stands for the proposition that "there is an obligation of good faith in the performance and enforcement of every contract." 303 Or at 561. "Enforcement" refers to the enforcement of both promises and rights, including the

---

motives. Judge Edmonds offers only subjective value judgments for taking the extra step here that the Oregon Supreme Court has never taken in any intentional interference case, and has strongly indicated is an impermissible step.

right to foreclose.[1] In this case, plaintiffs alleged that defendant maliciously timed the enforcement of its right to foreclose in order to prevent a sale that would have preserved some of plaintiffs' equity. *Sheets v. Knight*, 308 Or 220, 233, 779 P2d 1000 (1989), repeats that contracts must be enforced in good faith. A careful reading of *Sheets* indicates that it did not intend to restrict the use of the doctrine to business contracts, but instead reaffirmed the traditional principle that the doctrine does not apply to an employer's right to discharge at will. 308 Or at 233.

For several reasons, the majority's reliance on *Sheets* and *Harris v. Griffin*, 109 Or App 253, 258, 818 P2d 1289 (1991), is misplaced. The majority's holding that the doctrine of good faith is inapplicable to the termination of all contracts rests on the following language from *Sheets*:

> "The foundation of the *at-will employment* contract is the express or implied understanding that either party may terminate the contract for any reason, even for bad cause. A duty of good faith and fair dealing is appropriate in matters pertaining to on-going performance of *at-will employment* agreements. It is not appropriate to imply the duty if it is inconsistent with a provision of the contract." 308 Or at 233. (Emphasis supplied.)

The termination clauses of at-will employment contracts are commonly understood as *sui generis*, and nothing in *Sheets* suggests otherwise.[2] It cannot be said that the foundation of most business contracts is that either party can terminate them, even for "bad cause."[3] The duty of good faith is commonly applied to the termination of at-will business contracts. *Cf. Seaward Yacht Sales v. Murray Chris-Craft*

---

[1] *Black's Law Dictionary* 528 (5th ed 1979) defines "enforce" as "causing to take effect." There is no indication that *Best* intended to narrow the definition of "enforcement."

[2] For a discussion of how the law of at-will contracts developed separately from general contract law, *see* Murray, *Murray on Contracts* §§ 38, 57 (3rd ed 1990) (At-will contracts a "stark exception" to rule that courts will imply reasonable duration in at-will contract; (interpretation of at-will franchise agreements not modelled on interpretation of at-will employment contracts.

[3] Furthermore, "bad cause" is a term peculiar to employment law. "Bad cause" is not the same as improper motive, *i.e.*, bad faith. At-will contracts *are* breached by a long list of improper motives, which are now defined by statute. *Farrimond v. Louisiana-Pacific Corp*, 103 Or App 563, 566, 798 P2d 697 (1990).

*Cruisers,* 701 F Supp 766 (D Or 1988); *see also Johnson v. School District No. 12,* 210 Or 585, 312 P2d 591 (1957).

Even if we import "at-will" employment contract law into the area of business contract law, as the majority does, *Sheets* leaves open the possibility that a party who terminates an at-will contract for an improper purpose (as opposed to "bad cause," which has a specialized meaning in the context of employment law) might have breached the implied duty of good faith.

> "In *dicta* we twice suggested that the covenant might be implied in at-will contracts. *See State ex rel Roberts v. Public Finance Co.,* 294 Or 713, 719 n 4, 662 P2d 330 (1983); *Best v. U.S. Bank,* 303 Or 557, 564, 739 P2d 554 (1987). Although these cases referred to at-will employment, the *dicta* is better understood as dealing with situations in which the employee had developed a reasonable expectation of continued employment. Because at-will employees may be fired at any time and for any reason, they have no reasonable expectation of continued employment. Such a reasonable expectation is only present where the at-will contract has been supplanted by some other contractual relationship, like an implied-in-fact contract." 308 Or at 234 n 13.

In other words, where there is a reasonable expectation of continued employment, the doctrine of good faith might apply to termination. Here, plaintiffs have pleaded enough facts to support a reasonable expectation that defendant would not intentionally and maliciously endanger plaintiff's investment, and, if we follow *Sheets,* the question of whether the doctrine of good faith applies remains open.

The majority's reliance on *Harris v. Griffin, supra,* is also misplaced. That decision explicitly refused to decide whether the doctrine of good faith applies to a real property seller's right to declare a default and accelerate. 109 Or App at 258. *Harris* is distinguishable from this case because the plaintiffs in *Harris* never alleged that the seller had an improper motive.

It bears repeating that this is a review of a trial court's dismissal pursuant to a Rule 21 motion, and that we must accept the plaintiff's allegations as true. Under *Best,* plaintiffs have adequately pleaded a breach of the duty of good faith and fair dealing. Therefore, their contract claim was

improperly dismissed. For the same reason, their tort claim for breach of the duty of good faith was also improperly dismissed.

I disagree with the majority's statement that holding Seafirst's conduct tortious would render default remedies unavailable to any lender who offered a borrower assistance. 127 Or App at 363. The default remedy would be available as long as the lender did not act with malice.

For these reasons, I concur in part and dissent in part.

**EDMONDS J.,** concurring in part, dissenting in part.

In this appeal from a judgment of dismissal under ORCP 21A(8), plaintiffs argue that the trial court erred when it dismissed their claims for tortious breach of the duty of good faith and fair dealing (first claim for relief), breach of the contractual duty of good faith and fair dealing (second claim for relief), tortious interference with a contractual relationship (third claim for relief), and tortious interference with an economic relationship (fourth and fifth claims for relief). The majority affirms the trial court's ruling on the first two claims. I would affirm the trial court's ruling on all claims.

The gravamen of the first claim is the allegation that there was a "special relationship of trust and confidence" among the parties that imposed a duty on defendants "not to harm plaintiffs' interests by its conduct," and that defendants breached that duty by initiating a foreclosure action and seeking a court ordered receivership regarding a loan made by defendants to plaintiff. Although the complaint is not explicit, it appears from the tenor of the allegations that plaintiffs concede that they were in default and that the loan agreement confers the right to defendants to seek a receiver and foreclose in the event of a default. The claim is predicated on the argument that the nature of the relationship among the parties imposed a standard of care on defendants that was independent of the terms of the contract. The majority holds that the allegations do not allege a breach of duty as a matter of law, because plaintiffs do not allege sufficient facts to constitute an estoppel or to imply a good faith duty under the circumstances. It reasons that to imply such a duty would be

inconsistent with the express terms of the agreement that gives defendants the right to foreclose on default.

In *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 831 P2d 7 (1992), the court discussed when a tort remedy lies for breach of a duty independent of the terms of the contract. It said:

"When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence if the other party is subject to a standard of care independent of the terms of the contract. If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of contract was negligent, intentional, or otherwise. In some situations, a party may be able to rely on either a contract theory or a tort theory or both. *See Ashmun v. Nichols*, 92 Or [223, 234-35, 178 P 234, 180 P 510 (1919)]." 313 Or at 106.

An example in which a party might rely on both theories would be when a tenant suffers personal injury as the result of basement steps that were left in a dangerous condition by the landlord. Under the lease, the condition of the steps would be a breach of the landlord's covenant to maintain the premises in good repair. Alternatively, the law imposes an independent duty on the landlord to maintain the premises in an habitable conditions. *See* ORS 90.320. Another example occurred in *Georgetown Realty Inc. v. The Home Ins. Co., supra*. There, an insured brought a claim against an insurer alleging that the insured was negligent when it failed to settle a claim against the insured for the limits of the coverage under the policy. The court held that, when the liability insurer undertook to defend, the law imposed a duty independent of the policy to use reasonable care, and the failure to exercise that standard gave rise to a claim for negligence.

These examples are instructive when plaintiffs' allegations about "the special relationship of trust and confidence" among the parties are considered. The gist of their

claim is that because of the ongoing nature of the relationship with defendants, a duty was imposed on defendants not to foreclose under the circumstances, even though plaintiffs were in default. Whatever that duty was, it was part of the loan agreement and not independent of it. No tort remedy exists in the absence of an independent duty, and the trial court correctly granted defendants' motion to dismiss the claim.

The second claim alleges a breach of a contractual implied duty of good faith not to seek a receivership or foreclose when defendants knew that the foreclosure would "destroy plaintiffs' ability to recover their investment." The majority holds that an implied duty of good faith does not exist if it is inconsistent with an express right under the agreement. It reasons that because the agreement gives defendant the absolute or unqualified right to foreclose on default, it is immaterial what defendant's motive was. I agree and comment only to point out that the majority's reasoning is consistent with the court's opinion in *U.S. National Bank v. Boge*, 311 Or 550, 814 P2d 1082 (1991). In that case, the borrower counterclaimed against a bank that had sued him on several delinquent promissory notes. He asserted that the bank had breached its duty of good faith by, in part, foreclosing on his loan. The court said:

> "The obligation of good faith does not vary the substantive terms of the bargain * * *, nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract * * *." 311 Or at 567.

The third claim for relief is for tortious interference with a contractual relationship in that "Defendants intentionally interfered with plaintiffs' contractual relations with a buyer for the Uptown Heights Apartments * * *." A necessary predicate for an action for interference with a contractual relationship is an existing contract. *Luisi v. Bank of Commerce*, 252 Or 271, 449 P2d 441 (1969). According to plaintiffs' complaint, defendants initiated a foreclosure action and requested appointment of a receiver on August 2, 1991. A sale was scheduled for December 20, 1991. It was not until after November 7, 1991, that plaintiffs entered into a binding sales agreement with a purchaser. Any claim for tortious interference with a contractual relationship must

necessarily have arisen from defendants' actions after the sales agreement was signed.

Plaintiffs make only one allegation of interference against defendants that pertains to that time period. "Seafirst refused to allow any extension of the foreclosure time period and continued to demand that it be paid in full prior to the foreclosure sale." In *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 582 P2d 1365 (1978), the court said:

> "In summary, [a claim for intentional interference with contractual or other economic relations] is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession. No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the acts charged would be tortious on the part of an unprivileged defendant. Even a recognized privilege may be overcome when the means used by defendant are not justified by the reason for recognizing the privilege." 283 Or at 209-10. (Footnote omitted.)

A defendant is entitled to a dismissal of a claim that does not allege the necessary factual elements of the tort. If the facts giving rise to a recognized privilege appear on the face of the pleading, then the pleader must plead facts that demonstrate that the means used by the defendant are not justified by the reason for recognizing the privilege. *Ramirez v. Selles*, 308 Or 609, 612, 784 P2d 433 (1989).

There is no allegation in the third claim that defendants breached their loan agreement with plaintiffs by refusing to extend the sale, nor is there an allegation that the loan agreement is contrary to law or public policy. In other words, the refusal to extend the sale was a privilege bestowed on defendants by the terms of the loan agreement. Therefore, the means of the interference was proper. Plaintiffs also allege that "[t]he defendants' motive in such interference was to injure the contractual relations and make the sale for their own benefit, to the detriment of plaintiffs." Thus, the issue is whether plaintiffs have stated a claim for intentional interference with a contractual relationship when they do not

allege an interference by improper means, but do allege conduct that is privileged under the loan agreement, albeit improperly motivated.

So far as I can determine, that precise question has not been expressly answered by the Oregon appellate courts. The majority believes the issue has been answered in *Ramirez v. Selles, supra*. However, there the court concluded that the allegations about the defendant's actions "do not on their face show that [his] acts would be privileged as those of a competitor." 308 Or at 614. Consequently, the allegations about improper motive sufficed to state a claim. This case is inapposite to *Ramirez* because as alleged, defendants' conduct was authorized by the parties' agreement. Therefore, the privilege does exist here and the question becomes whether defendants' motive is material in light of the nature of the privilege. Moreover, the majority appears to believe that I support a general rule that whenever a privilege exists, the actor's motive will always be immaterial. That is incorrect, because I understand the court in *Top Service Body Shop v. Allstate Ins. Co., supra*, to say that a purpose to harm the injured party is but one factor that could make the interference improper. 283 Or at 207. The materiality of an improper motive will depend on the particular privilege involved.

Because of our standard of review in this case, any ruling must be confined to the facts that appear on the face of the complaint and the inferences that can be drawn therefrom. The analysis begins with a basic legal proposition: "Not all interferences with economic relationships are tortious." For instance, the allegation in this claim that defendants "made the sale for their own benefit" could hardly be characterized as an improper interference by defendants in the absence of allegations that suggest that the procurement of a foreclosure judgment under the circumstances was improper. The loan agreement was in default, and defendants were entitled to be paid. Moreover, the claim does not allege that defendants received at sale more than what was owed to them including principal, interest and the cost of the foreclosure proceeding.

The second legal proposition that is pertinent to the analysis is that a distinction exists between situations in

which the actor's conduct is privileged and in which it is unprivileged. *See Top Service Body Shop v. Allstate Ins. Co., supra*, 283 at 210. When the conduct is unprivileged, then the interference may be improper because the actor had an improper motive or employed improper means to effect the interference. When the conduct is privileged but the actor employed improper means to carry out the interference, the privilege is lost. *See Ramirez v. Selles, supra*, 308 Or at 612. There is no public policy reason to provide a defendant with tort immunity when he acts with improper means. However, different policy concerns come into play when the defendant's conduct is privileged, and he acts within the law or as authorized by a consensual arrangement such as a contract. If a party to a contract does what the law and the agreement permit him to do, should he be guilty of a tort because of his motivation? To answer that query, it is important to look at the underlying purpose for providing a tort remedy for an interference with a contractual relationship.

In Oregon, the tort of interference with a contractual relationship finds its origin in section 766 and section 766A of *Restatement (Second) Torts*. Although the comments to those sections might be read as suggesting that the presence of an improper motive can create liability despite the privileged nature of the conduct, to promulgate such a rule under the circumstances of this case would be contrary to public policy. The justification for tort liability depends on an "improper" interference with an economic relationship. The impropriety of the interference under the allegations pled in his case disappears because defendants' conduct is privileged by the agreement of the parties. *See Maynard v. Caballero*, 752 SW2d 719 (Tex App 1988). Plaintiffs' tortious interference claim is predicated on conduct which involves no more than the exercise of an absolute legal and contractual right by defendants arising from the agreement with plaintiffs. In a legal sense, plaintiffs have previously consented to the conduct about which they now complain.

A contrary holding in this case sends a message that promotes instability of contractual obligations, litigious interference with traditional legal and contractual remedies of creditors, and havoc with how commercial and private

lenders do business. *See* Perlman, "Interference with Contract and Other Economic Expectancies," 49 Chi L Rev 61 (1982). "The result becomes even more incongruous in view of the fact that punitive damages could also attach." *Circo v. Spanish Gardens Food Mfg. Co., Inc.*, 643 F Supp 51, 56 (W D Mo 1985).[1] Policy wise, the majority's decision on the facts alleged means that lenders can perform fully all of their obligations under a loan agreement and still be unable to enforce contractual remedies. A privilege like the one in this case cannot be lost because of defendants' "improper thoughts." As a matter of law and policy, no one is liable for a tort when they sought to foreclose on security after a default occurred if they acted in accordance with the law and their rights under a loan agreement. For this reason, I disagree with the majority's holding that plaintiffs' third claim states a cause of action.

There is another defect in the pleading of the third claim that exists because of the conclusory nature of plaintiffs' allegations. In *Conklin v. Karban Rock, Inc.*, 94 Or App 593, 767 P2d 444, *rev den* 307 Or 719 (1989), the defendant alleged that it had entered into a written lease with a third party (Jenkins) which allowed the defendant to apply for a conditional land use permit to quarry rock on land owned by Jenkins. Thereafter, the defendant and Jenkins entered into an oral modification of the lease to include additional land that was adjacent to that covered by the written lease. Jenkins also agreed to aid the defendant when it applied for a permit to quarry rock on the additional land. After the oral agreement was reached, the defendant pursued an application for a conditional use permit for the enlarged site. The plaintiff led the opposition to the application. Before the oral

---

[1] In *Maynard v. Caballero, supra*, the court held that an interference with contractual relations is privileged when it results from the exercise of a party's own rights or where the party possessed an equal or superior interest to that of the plaintiff in the subject matter. In other jurisdictions, there is disagreement as to whether a claim for tortious interference with a contract can be predicated on an act which involves no more than the exercise of an otherwise absolute legal right. In *Colorado Interstate Gas v. Natural Gas Pipeline*, 885 F2d 683, 691 (10th Cir 1989), *cert den* 498 US 972 (1990), the court held that a motive can be a determinative factor in converting otherwise lawful behavior into "improper conduct" for which the defendant can be liable. However, in *Edwards Transports v. Circle S Transports*, 856 SW2d 783 (Tex App 1993), the court held that if a defendant's interference is justified as a matter of law, a finding of actual malice is irrelevant. *See also Circo v. Spanish Gardens Food Mfg. Co., Inc., supra.*

agreement could be memorialized, Jenkins notified the defendant that she considered the initial lease terminated because of the defendant's failure to make minimum monthly royalty payments. Jenkins then sold the land to the plaintiff.

The plaintiff filed an action for a declaration that the lease was terminated. He alleged that the defendant was in breach of the lease because of the failure, among other things, to make royalty payments. The defendant denied that the lease was terminated and counterclaimed against the plaintiff alleging that he had intentionally interfered with its economic relationship with Jenkins. The gravamen of the claim was that the plaintiff knew of the lease and the alleged oral modification, that he induced Jenkins not to perform her agreement by offering to buy the property from her for more than she would get from the defendant, and that he agreed to indemnify, defend and hold Jenkins harmless from the defendant's claims that Jenkins had breached the lease. The counterclaim was dismissed under ORCP 21A(8) for failure to state a claim, and the defendant appealed.

On appeal, we held that there were insufficient allegations that the plaintiff had acted by improper means.[2] We then turned to the question of whether the defendant had pled that the plaintiff had acted with an improper motive. It alleged that the plaintiff's motive in purchasing the land was to prevent the land from being quarried and in conclusory terms, that the plaintiff had acted with the motive and intent of harming the defendant. We observed that in *Top Service Body Shop v. Allstate Ins. Co., supra*, the court had held that although the plaintiff had alleged in that case that the motive of the defendant was to harm the plaintiff, when the proof was that the defendant had pursued only a legitimate business objective, no claim existed. Accordingly, we said:

"Here, the facts alleged by [the defendant] in its counterclaim and brief show that [the plaintiff] engaged in conduct on behalf of an environmental protection group that was

---

[2] We said:

"Improper means are those which are independently wrongful, notwithstanding the injury caused by the interference. They may be wrongful by reason of statutory or common law and included violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood." 94 Or App at 601. (Citation omitted.)

opposed to the quarrying of rock on the property and that his motive was predominantly to protect the land in question from quarrying. [The defendant] alleges a specific course of conduct engaged in by [the plaintiff] designed to protect that land, yet it makes only a single conclusory allegation that [the plaintiff's] motive was to injure [the defendant]. If [the defendant] was injured, its injury was only incidental to [the plaintiff's] prevention of quarrying by anyone. Taken as a whole, the pleadings fail to allege sufficient facts to show an improper motive on the part of [the plaintiff]." 94 Or App at 602.

The allegations about defendants' motive are conclusory just as they were in *Conklin*. There, the allegation was that the plaintiff's motive was to injure the defendant. Here, plaintiffs allege that defendants' motive was to injure plaintiffs' contractual relations and make the sale for their own benefit. How defendants benefitted beyond what they were entitled to as a result of the legal remedies available to them is not alleged. It is impossible to discern from the pleading what facts plaintiffs claim demonstrate that defendants' motives were "legally improper." We should affirm the trial court on either basis.

The fourth claim is for tortious interference with the "existing and future business relationship" between plaintiffs and their buyers because defendants sought a receiver and foreclosed on plaintiffs' loan. It alleges that:

"The defendants' motive in such interference was to injure the business relations and make the sale for their own benefit, to the detriment of plaintiffs."

The same analysis applies here. The *Restatement* recognizes that prospective economic relationships are afforded less protection than existing contractual relationships. *Restatement (Second) Torts* § 766B, *comment e* (1979). Based on the facts alleged by plaintiffs, the pursuit of a foreclosure judgment after default and the requesting of the appointment of a receiver are not improper interferences because those acts are permitted by the loan agreement. Plaintiffs plead no facts that allow the reader to infer that the interference that resulted from defendants' exercise of their rights was improper. Plaintiffs' economic self-interest in developing prospective business relations must yield to their established contractual obligations. *See Ramirez v. Selles, supra*, 308 Or

at 613. Moreover, the fourth claim does not state a cause of action because of the conclusory nature of the allegation about defendants' purported improper motive and the absence of any supporting factual allegations. I would hold that the trial court did not err in dismissing it.

The fifth claim alleges that defendants interfered with an economic relationship between one of the plaintiffs and a third party who was negotiating with defendants for a loan. It claims that defendants refused to loan monies to the third party unless the third party removed plaintiff as "its joint venture partner." The claim asserts that defendants' "motive in such interference was to injure the business relations to the detriment of plaintiffs and defendants acted in bad faith."

Again, our ruling depends on the facts alleged in the claim. The general rule is that the mere refusal to make a loan to a third party is not tortious conduct. *See Restatement (Second) Torts* § 766, *comment b* at 8 (1979). In that sense, defendants' conduct was privileged. Because it appears on the face of the claim that defendants' conduct was privileged, plaintiffs must allege facts which show that their privilege should not be recognized under the circumstances. *Ramirez v. Selles, supra,* 308 Or at 612. The *Restatement* also recognizes that economic pressure is a common means of inducing one person not to deal with another and that not all economic pressure is an "improper interference." The question of whether the interference is improper is

> "[a]nswered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective." *Restatement (Second) Torts* § 767, *comment c* at 31 (1979).

The issue is whether plaintiffs have alleged enough facts to plead a required element of the tort; that defendants' privilege to make the loan to the third party conditional was forfeited by improper economic pressure. To supply that requirement, plaintiffs rely on the allegation that defendants imposed the condition "to injure the business relations" of

the plaintiffs and that they "acted in bad faith." The latter allegation is a bald conclusion. The former alleges an improper motive, not improper means. I cannot discern from the pleading how the privilege was forfeited when it is not alleged how defendants used an improper means of economic pressure. Even if defendants' motive was to injure the plaintiffs' business relationship, their motive is immaterial because of the nature of the interference. Again, I would conclude that the plaintiffs have failed to allege sufficient facts to state a claim in its fifth claim.

For these reasons, I disagree with the majority's holdings regarding the third, fourth and fifth claims.

Landau, J., joins in this concurring and dissenting opinion.