Argued and submitted December 8, 1994, decision of the Court of Appeals and judgment of the circuit court affirmed in part and reversed in part; case remanded to the circuit court for further proceedings March 30, 1995

## UPTOWN HEIGHTS ASSOCIATES LIMITED PARTNERSHIP,
a Washington limited partnership,
Leavitt, Shay (Uptown), Inc.,
a Washington corporation, and
Leavitt, Shay & Company, Inc.,
a Washington corporation,
*Petitioners on Review/*
*Respondents on Review,*

*v.*

## SEAFIRST CORPORATION,
a Washington corporation and
registered bank holding company,
and Seattle-First National Bank,
a national banking association,
*Respondents on Review/*
*Petitioners on Review.*

(CC 9203-02042; CA A75880; SC S41412, S41413)

891 P2d 639

Jacob Tanzer, of Ball, Janik & Novack, Portland, argued the cause for petitioners on review/respondents on review Uptown Heights Associates Limited Partnership, et al. With him on the petition and briefs was Bruce W. DeKock.

Rodney E. Lewis, of Davis Wright Tremaine, Portland, argued the cause and filed the briefs for respondents on review/ petitioners on review Seafirst Corporation, et al.

James L. Murch, of Sherman, Bryan, Sherman & Murch, Salem, filed a brief on behalf of *amicus curiae* Oregon Bankers Association.

Henry Kantor, of Kantor and Sacks, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association. With him on the brief were Richard H. Braun, Thomas K. Coan, and Phil Goldsmith.

GRABER, J.

Unis, J., filed a concurring opinion in which Fadeley, J., joined.

## GRABER, J.

This case involves a loan by a bank to a developer. The developer claims that the bank breached its duty of good faith[1] and intentionally interfered with the developer's economic relations. The circuit court dismissed the complaint; the Court of Appeals reversed with respect to the intentional interference claims. *Uptown Heights Associates v. Seafirst Corp.*, 127 Or App 355, 368, 873 P2d 438 (1994). We hold that the developer failed to state a claim with respect to the first through fourth claims for relief but that it stated a claim with respect to the fifth claim for relief.

### FACTS AND PROCEDURAL BACKGROUND

■ This case comes to us on review of an ORCP 21 A(8) motion.[2] Therefore, we assume the truth of all well-pleaded facts alleged in the complaint and give plaintiffs the benefit of all favorable inferences that may be drawn from those facts. *Stringer v. Car Data Systems, Inc.*, 314 Or 576, 584, 841 P2d 1183 (1992).

The present controversy arose from a construction loan made to plaintiffs, Uptown Heights Associates Limited Partnership; Leavitt, Shay (Uptown), Inc.; and Leavitt, Shay & Company, Inc. (collectively referred to as "Uptown" in this opinion), by defendant Seattle-First National Bank (Bank).[3]

In 1988 or 1989, Bank learned of Uptown's plans to construct a "high-end" apartment complex in Portland. Bank aggressively solicited Uptown and, on June 20, 1989, Uptown entered into a construction loan agreement with

---

[1] In this opinion, we use the term "duty of good faith" to describe a concept developed in several prior cases; that concept has received a variety of labels in the past. *See Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 344 n 1, 876 P2d 761 (1994) (explaining use of term).

[2] ORCP 21 A provides in part:

"Every defense, in law or fact, to a claim for relief in any pleading, whether a complaint, counterclaim, cross-claim or third party claim, shall be asserted in the responsive pleading thereto, except that the following defense may at the option of the pleader be made by motion to dismiss: * * * (8) failure to state ultimate facts sufficient to constitute a claim[.]"

[3] According to the complaint, defendant Seattle-First National Bank acted as defendant SeaFirst Corporation's agent in connection with the events at issue. The roles of the two defendants are interconnected, and our references to "Bank" include both.

Bank. Uptown borrowed $7,500,000, with interest at one-half of one percent over prime. The loan was secured by a deed of trust on the land and buildings that comprised the apartment complex.[4]

Under the terms of the loan, Uptown was to pay monthly interest until the loan matured. The principal amount was due at maturity, January 1, 1991, with a provision for two six-month extensions until January 1992.

Soon after construction of the apartment complex was completed, the rental market dropped dramatically from Uptown's pre-construction forecasts. For that reason, Uptown encountered difficulty in meeting its obligation to make its monthly interest payments on the loan. In October 1990, Bank agreed to one six-month extension on the loan. Although rental rates improved in late 1990 and early 1991, Uptown was unable to make its full interest payment to Bank in April 1991. Bank had the apartment complex appraised by an independent appraiser; the appraised value was $8,850,000, slightly more than $1 million above the outstanding balance of Bank's loan to Uptown.

Uptown and Bank continued to negotiate concerning the loan. Bank personnel who handled the loan assured Uptown that Bank would work with Uptown to resolve any problems surrounding the loan. Despite those assurances, in June 1991, Bank elected not to grant the second six-month extension. Bank transferred the Uptown account to a department for problem loans known as "Special Credits." Bank also refused to lend money for an unrelated joint venture project involving Uptown (among others) unless Uptown were removed as a participant. Bank personnel began to threaten foreclosure on the apartment complex. That pressure forced Uptown to seek a quick sale to try to avoid the harm to its investment and business reputation that would flow from a foreclosure.

---

[4] Although Uptown's claims hinge on the existence of a contract or contracts, Uptown did not attach to its complaint the contract(s) that gave rise to this action. Because this case comes to us on review of a motion to dismiss, and because Uptown's complaint alleges the existence and key terms of a contract or contracts, we can resolve the issues presented in this case based on the pleadings.

Uptown told Bank that it planned to sell the apartment complex and notified Bank that a foreclosure action would damage or destroy Uptown's chances of selling the complex and avoiding a foreclosure sale. Uptown told Bank that potential buyers would have no interest in buying the property from Uptown if they knew that it was threatened with foreclosure, because buyers typically wait to try to buy such a property at a bargain price after foreclosure.

On July 29, 1991, Uptown received an offer to purchase the apartment complex from a buyer in Bend. On July 31, 1991, Uptown notified Bank of that offer. On August 2, 1991, Bank initiated a foreclosure action, filed for appointment of a receiver, and scheduled a trustee's sale for December 20, 1991. Before the hearing on the appointment of a receiver, Uptown provided Bank with the purchase offer that it had received. Bank refused to postpone the hearing to permit further negotiations between Uptown and the offeror and, as a result, the offeror did not proceed further.

The receivership hearing was held on August 16, 1991. The court appointed a receiver chosen by Bank. Uptown continued to look for a buyer for the apartment complex to avoid the harm that would result to its business reputation from a foreclosure sale and to attempt to recover some of its investment. On October 22, 1991, Uptown notified Bank that it had received a second offer for the apartment complex, which would result in a price of between $8.1 and $8.6 million. Uptown also asked that the receiver be replaced immediately. Bank responded to the October 22 notice on November 7, 1991. At that time, Bank refused to extend the foreclosure sale to permit steps to be followed toward closing the sale proposed by Uptown.

Uptown continued to negotiate with the second potential buyer and provided Bank with a copy of a signed purchase agreement. Uptown again asked Bank to postpone the foreclosure sale, this time for the purpose of allowing the second potential buyer to arrange for financing. Bank refused. Uptown and the second potential buyer were unable to work out an agreement under which they could meet Bank's deadline for a full payoff before the foreclosure sale. The foreclosure sale took place on December 20, 1991. Bank bid $7.8 million (the outstanding balance of the loan) and

took title to the apartment complex. In January 1992, Bank entered into a purchase and sale agreement with the same second potential buyer for $7.8 million. Uptown received nothing.

Uptown brought this action against Bank, raising one claim for "breach of contractual duty of good faith and fair dealing," one claim for "tortious breach of the duty of good faith and fair dealing," and three claims for intentional interference with economic relations. The circuit court dismissed the complaint, pursuant to ORCP 21 A(8), on the ground that Uptown failed to state facts sufficient to constitute a claim. The Court of Appeals, sitting *in banc*, affirmed as to the duty of good faith claims, but reversed as to the claims for intentional interference with economic relations. *Uptown Heights Associates*, 127 Or App at 368. In a separate opinion, Judge Riggs concurred with respect to the claims for intentional interference with economic relations, but dissented with respect to the good faith claims. *Id.* at 368-71 (Riggs, J., concurring in part and dissenting in part). In another separate opinion, Judge Edmonds (joined by Judge Landau) concurred with respect to the duty of good faith claims, but dissented with respect to the claims for intentional interference with economic relations. *Id.* at 371-81 (Edmonds, J., concurring in part and dissenting in part).

This court allowed both parties' petitions for review. For the following reasons, we now affirm in part and reverse in part the decision of the Court of Appeals.

### IMPLIED CONTRACTUAL DUTY OF GOOD FAITH (FIRST CLAIM FOR RELIEF)

This court recently addressed the scope of the duty of good faith in *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 876 P2d 761 (1994). *Pacific First Bank* involved a lease agreement that prevented a tenant from transferring the lease without the landlord's approval. 319 Or at 344. In that case, the tenant merged into its wholly owned subsidiary, thus effecting a transfer of the lease requiring the landlord's consent. *Id.* at 345. The landlord refused to grant consent. *Ibid.* This court held that, although a duty of good faith applied to the lease agreement, the landlord did not breach that duty, "because the landlord's refusal did not contravene

the 'reasonable expectations' of the parties as manifested in the express terms of the lease agreement at issue." *Id.* at 344.

This court reiterated in *Pacific First Bank* that every contract contains an implied duty of good faith. *Id.* at 350. That duty "is to be applied in a manner that will effectuate the reasonable contractual expectations of the parties." *Id.* at 353 (citation omitted; internal quotation marks omitted). But, "it is only the *objectively* reasonable expectations of [the] parties that will be examined in determining whether the obligation of good faith has been met." *Tolbert v. First National Bank*, 312 Or 485, 494, 823 P2d 965 (1991) (emphasis added; footnote omitted); *see also Pacific First Bank*, 319 Or at 352 (quoting *Tolbert* with approval). In *Pacific First Bank*, the court also restated the precept that the duty of good faith cannot serve to contradict an express contractual term:

> "This court has emphasized that
>
> " '[t]he obligation of good faith does not vary the substantive terms of the bargain * * *, nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract * * *.'
>
> "*U.S. National Bank v. Boge*, 311 Or 550, 567, 814 P2d 1082 (1991)." *Pacific First Bank*, 319 Or at 352-53.

Under the foregoing established principles, if a written contract between the parties expressly allows for a particular remedy by one of the parties, in the face of a specified breach, the parties' objectively "reasonable expectations" under the contract include the invocation of that remedy in the face of that breach. The party invoking its express, written contractual right does not, merely by so doing, violate its duty of good faith.

The agreement between Uptown and Bank, as pleaded by Uptown, gave Bank the right to foreclose should Uptown default on the loan. Uptown also pleaded that it defaulted on the loan. Uptown did not plead any additional facts that would support a claim for violation of the duty of good faith. For example, Uptown did not plead that Bank *caused the default* to occur, which in turn gave rise to the contractual right to foreclose. Neither did Uptown plead that Bank failed to follow the proper *method* of foreclosure.

Uptown argues that, when a contract gives one party discretion as to when to invoke a bargained-for remedy, the circumstances giving rise to that invocation may permit a claim for breach of the duty of good faith. Uptown argues that this duty was breached when Bank refused to grant the second loan extension and continued to seek foreclosure, because those acts would harm Uptown, while Bank would derive no benefit. In support of its argument, Uptown relies on statements made by this court in *Best v. U.S. National Bank*, 303 Or 557, 739 P2d 554 (1987). Reliance on *Best* is misplaced in this context.

In *Best*, the court considered whether a bank's fees for processing nonsufficient fund (NSF) checks were so high as to violate the bank's duty of good faith in the performance of its account agreements with its depositors. 303 Or at 561-66. Under the bank's contracts with its customers, the bank "had the contractual discretion to set its * * * fees." *Id.* at 564. Because the court concluded that there was a "genuine issue of material fact whether the Bank set its * * * fees in accordance with the reasonable expectations of the parties," *id.* at 565, the court held that the defendant's motion for summary judgment should not have been granted on that issue, *id.* at 566. In reaching that conclusion, the court stated:

> "When one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that that discretion will be exercised for particular purposes. If the discretion is exercised for purposes not contemplated by the parties, the party exercising discretion has performed in bad faith." *Id.* at 563.

Relying on *Best*, Uptown argues that the underlying purpose of Bank's power to foreclose was to secure its loan. That was the reasonable expectation of the parties when they bargained for the foreclosure provision in the contract. Because the value of the property was in excess of the loan balance and because Uptown had located a prospective buyer who was willing to purchase the property for a price in excess of the balance, Uptown argues that "a jury may infer that [Bank] acted for some other purpose not consistent with the parties' expectations when they agreed that [Bank] would have this" contractual right to foreclose.

*Best* is inapposite, because in that summary judgment case that bank had the discretion to fill in an open price term, and no method of setting the NSF fee was spelled out in the depositors' contracts. "*Assuming that there was no agreement* [about the method of setting the NSF fee], the question before us is whether there is a genuine issue of material fact whether the Bank set its NSF fees in good faith." 303 Or at 562 (emphasis added). After examining the evidence before the court on summary judgment, the court concluded that there was a genuine issue of fact concerning the method by which that bank would exercise its discretion to set an NSF fee. *Id.* at 564-66.

By contrast, in this case, there was a specific agreement. The loan agreement as pleaded by Uptown authorizes foreclosure for any default, not merely for a default that jeopardizes security.

More to the point than *Best* is *Tolbert*, in which the contract contained an express price term. *Tolbert*, 312 Or at 490-91. In *Tolbert*, as in *Best*, this court addressed whether a bank had breached its duty of good faith to its depositors in setting and revising the fees that it charged to depositors for NSF checks. *Tolbert* originally was accepted as a companion case to *Best*. *Id.* at 488. In *Tolbert*, the court affirmed the trial court's grant of summary judgment precisely because the bank's customers were apprised of the fees that would be applied to their accounts when they entered their contracts with the bank. *Id.* at 491-93. The court in *Tolbert* wrote that

> "[t]he expectations of [the parties to a contract] are irrelevant if they have agreed to the [express terms of the contract that are at issue]. * * * [T]he *Best* court analyzed the reasonable expectations of the parties only after determining that it could not assume the existence of an agreement." *Id.* at 492.

Here, Uptown has pleaded that it defaulted on the interest payments that it was required to make under the loan and that the remedies pursued by Bank are expressly permitted by the parties' written contract in the event of such a default. Uptown's pleading does not suggest that the contract contained any other precondition on Bank's right to foreclose, except for such a default. The contractually described purpose of Bank's power to foreclose was, then, to remedy a default. Thus, "[i]n the present case, the reasonable

contractual expectations of the parties are shown, by the unambiguous terms" of the contract as those terms are relayed in Uptown's pleadings. *See Pacific First Bank*, 319 Or at 353 (stating principle). Under those terms, "the parties agreed to — that is, reasonably expected — a unilateral, unrestricted exercise of discretion" in Bank's choice of foreclosure as a remedy should Uptown breach the contract by failing to make its mortgage payments. *See id.* at 354 (stating principle).

Accordingly, the trial court did not err when it dismissed the first claim for relief. The Court of Appeals properly sustained that dismissal.

### "TORTIOUS BREACH OF THE DUTY OF GOOD FAITH" (SECOND CLAIM FOR RELIEF)

Uptown next argues that the Court of Appeals erred when it affirmed the circuit court's dismissal of a claim for "tortious breach of the duty of good faith." Uptown alleged that there was "a special relationship of trust and confidence" between Bank and Uptown, imposing on Bank "a duty not to harm [Uptown's] interests by its conduct." Bank allegedly breached that duty by initiating a foreclosure action and seeking a court-ordered receivership when such a remedy would harm Uptown and be of no benefit to Bank.

In *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 831 P2d 7 (1992), an insured brought a claim against an insurer, alleging that the insurer was negligent when it failed to settle the third party's claim against the insured. This court held that, when the insurer undertook the responsibility to defend the insured, the law imposed a duty on the insurer, independent of the insurance policy, to use reasonable care; the failure of the insurer to exercise reasonable care thus gave rise to a claim for negligence. 313 Or at 110-11. The court reasoned:

> "The lesson to be drawn from this court's cases * * * is this: When the relationship involved is between contracting parties, and the gravamen of the complaint is that one party caused damage to the other by negligently performing its obligations under the contract, then, and even though the relationship between the parties arises out of the contract, the injured party may bring a claim for negligence *if the other*

*party is subject to a standard of care independent of the terms of the contract.* If the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract, with contract measures of damages and contract statutes of limitation. That is so whether the breach of contract was negligent, intentional, or otherwise." *Id.* at 106 (emphasis added).

Uptown has pleaded that "[t]here was a special relationship of trust and confidence" between it and Bank, because of their past "course of dealing," which created a standard of care independent of the contract. Uptown's allegations fall into four categories:

(1) Uptown alleged that Bank had a selfish incentive for entering into the loan transaction. (For example, Uptown alleged that "[Bank's] personnel used [Uptown] as a means to satisfy their personal and professional goals" and that Bank "advertised [Uptown] as one of its special customers.")

(2) Uptown alleged that Bank negotiated aggressively toward the loan agreement and, in the course of those negotiations, made assurances to Uptown that Bank wanted Uptown to succeed. (For example, Uptown alleged that Bank "aggressively solicited the * * * loan, by telling the principals of [Uptown] that [Bank] wanted to continue to be its primary bank and lender [and] that they were the kind of customers [Bank] wanted." Uptown also alleged that Bank expressed assurance "that it would work with [Uptown] to make the project a success.")

(3) Uptown alleged that Bank had waived its contractual rights in other contracts with Uptown. (For example, Uptown alleged that, "[d]espite its contractual rights to do so, [Bank] did not enforce reporting and monitoring requirements on several [Uptown] and related entity loans, personal lines of credit or other agreements.")

(4) Uptown alleged that one of the principals and his family had a long personal relationship with Bank, during which Bank "did not strictly enforce its rights, conducted business informally and treated [the principal] as a special customer. [Bank] repeatedly told [the principal] that it would not do this, except for his special relationship with [Bank]."

■ Reading the allegations of the complaint in the light most favorable to Uptown, and giving Uptown the benefit of all favorable inferences, none of those allegations suggests a standard of care imposed on Bank in favor of Uptown, apart from the contract. The first two kinds of allegations suggest, to the contrary, that Bank had an arm's-length, commercial relationship of creditor to debtor with Uptown. The facts that Bank used aggressive sales tactics, that it made commercial use of its customer relationship with Uptown, and that its employees sought advancement from that commercial relationship do not impose a standard of care on Bank that is higher than that ordinarily applied to debtor-creditor relationships.

■ The third and fourth kinds of allegations suggest, at most, that Uptown and one of the principals (who is not an individually named plaintiff) had acquired a contractual right to expect forbearance with respect to *other* contracts, not at issue here. Uptown did not allege that the parties' past course of dealing resulted in any modification to the terms of the loan agreement at issue. Neither did Uptown allege that the parties' past course of dealing was itself of a fiduciary nature.

■ To summarize, none of Uptown's allegations suggests a standard of care imposed on Bank in favor of Uptown, apart from the loan agreement. In the absence of a standard of care independent of the contract, Bank was under no obligation to refrain from invoking its contractual right to foreclose after default.

The trial court did not err when it dismissed the second claim for relief, and the Court of Appeals properly sustained that dismissal.

## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS (THIRD, FOURTH, AND FIFTH CLAIMS FOR RELIEF)

Uptown's third, fourth, and fifth claims for relief are for tortious interference with economic relations. We separate our discussion of the fifth claim from our discussion of the other two, because it raises different issues.

## A. *Third and Fourth Claims for Relief*

■　In its third and fourth claims, Uptown contends that Bank interfered with contractual relations between Uptown and a prospective "buyer for the Uptown Heights Apartments." To state a claim for intentional interference with economic relations, a party must allege: (1) the existence of a valid business relationship or expectancy, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to economic relations, and (6) damages. *Straube v. Larson*, 287 Or 357, 360-61, 600 P2d 371 (1979); *Wampler v. Palmerton*, 250 Or 65, 73-76, 439 P2d 601 (1968). The dispositive issue here is the fourth element, the accomplishment of an interference through improper means or for an improper purpose.

■　It is settled that "[e]ither the pursuit of an improper objective of harming plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships may give rise to a tort claim for those injuries." *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 205, 582 P2d 1365 (1978). But, in order to prevail, a plaintiff must establish

> "not only * * * that defendant intentionally interfered with his business relationship but also that defendant had a duty of non-interference; *i.e.*, that he interfered for an improper purpose rather than for a legitimate one, or that defendant used improper means which resulted in injury to plaintiff. Therefore, a case is made out which entitles plaintiff to go to a jury only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Straube*, 287 Or at 361 (citations omitted; internal quotation marks omitted).

■　Uptown makes no allegation of improper means here. Uptown alleges only an improper purpose. The essence of Uptown's argument is that a party who invokes an express contractual remedy by proper means still may be liable for intentional interference with economic relations if that party simply has a malevolent reason for enforcing its written contract. We disagree. When a party invokes an express contractual remedy in circumstances specified in the written

contract — conduct that reflects, by definition, the reasonable expectations of the parties — that party cannot be liable for intentional interference with economic relations based solely on that party's reason for invoking the express contractual remedy. That is because, if the defendant has interfered with the plaintiff's economic relations, the defendant has done so for a "legitimate" purpose, *Straube*, 287 Or at 361 — invocation of an express, written contractual remedy — in such circumstances.[5]

A contrary ruling would contravene public policy and undermine the stability of contractual relations. As this court's decision in *Pacific First Bank* made clear, courts will not read implied terms into a contract if those terms would contradict the express terms of the contract. It would be anomalous to hold that a party to a contract nonetheless must defend a tort claim when a complaint shows that the party did precisely what the party was entitled to do under the contract. "Economic relations are controlled by contract[,] and the public [as well as the individual contracting party] has an interest in maintaining the security of such transactions." *Wampler*, 250 Or at 73.

Uptown's third and fourth claims for relief were properly dismissed by the trial court. The Court of Appeals erred when it reversed that dismissal.

## B. *Fifth Claim for Relief*

Uptown's fifth claim for relief alleges that Bank interfered with economic relations between Uptown and Wright Runstad & Co. (WRC), a third party negotiating with Bank for a loan. Uptown alleges that Bank "made funding in a major unrelated project with [WRC] in Bellevue, Washington, contingent on removing [Uptown] as its joint venture partner." Uptown also alleges: "The defendants' motive in such interference was to injure the business relations to the detriment of plaintiffs[,] and defendants acted in bad faith." Bank argues that Uptown did not sufficiently plead improper means or improper purpose.[6]

---

[5] Our holding is limited to the "improper purpose" prong of the tort.

[6] Bank has not argued that the "third party" element of this tort is lacking with respect to Bank's refusal to deal with the joint venture of which Uptown was a constituent part.

■  The general rule is that, ordinarily, one may refuse to deal with another and not be liable in tort for that refusal. *See, e.g., Tolbert,* 312 Or at 492-93 (approving of a bank's policy of not entering into a contract with a depositor if the depositor did not agree to the terms offered by the bank). Prior decisions by this court have not addressed the specific question whether a refusal to deal with another can be the basis of liability for the tort of intentional interference with economic relations. However, the Restatement provides some guidance. *See Top Service Body Shop,* 283 Or at 205-10 (looking to text and comments in Restatement for assistance in formulating and applying tort of intentional interference with economic relations); *Straube,* 287 Or at 361 (same).

The Restatement (Second) of Torts § 766 (1979), defines the tort of "Intentional Interference with Performance of Contract by Third Person." Two comments to that section discuss a "refusal to deal." Comment *b* states:

> "The rule stated in this Section does not apply to a mere refusal to deal. Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability." Restatement (Second) of Torts § 766, comment *b* at 8.

Comment *l* addresses "[i]nducement by refusal to deal":

> "A refusal to deal is one means by which a person may induce another to commit a breach of his contract with a third person. Thus A may induce B to break his contract with C by threatening not to enter into, or to sever, business relations with B unless B does break the contract. This situation frequently presents a nice question of fact. While, under the rule stated in this Section, A may not, without some justification induce B to break his contract with C, A is ordinarily free to refuse to deal with B for any reason or no reason. The difficult question of fact presented in this situation is whether A is merely exercising his freedom to select the persons with whom he will do business or is inducing B not to perform his contract with C. That freedom is not restricted by the relationship between B and C; and A's aversion to C is as legitimate a reason for his refusal to deal with B as his aversion to B. If he is merely exercising that freedom, he is not liable to C for the harm caused by B's choice not to lose A's business for the sake of getting C's.

"On the other hand, if A, instead of merely refusing to deal with B and leaving B to make his own decision on what to do about it, goes further and uses his own refusal to deal or the threat of it as a means of affirmative inducement, compulsion or pressure to make B break his contract with C, he may be acting improperly and subject to liability under the rule stated in this Section.

"Illustrations

"1.   Upon hearing of B's contract with C, A ceases to buy from B. When asked by B to explain his conduct, A replies that his reason is B's contract with C. Thereupon B breaks his contract with C in order to regain A's business. A has not induced the breach and is not subject to liability to C under the rule stated in this Section.

"2.   Upon hearing of B's contract with C, A writes to B as follows: 'I cannot tolerate your contract with C. You must call it off. I am sure that our continued relations will more than compensate you for any payment you may have to make to C. If you do not advise me within ten days that your contract with C is at an end, you may never expect further business from me.' Thereupon B breaks his contract with C. A has induced the breach and is subject to liability under the rule stated in this Section." Restatement (Second) of Torts § 766, comment *l*, and illustrations *1* and *2* at 13-14.

Applying those principles to the case at hand yields the following discussion. Bank may refuse to deal with WRC for any reason — including WRC's relationship with Uptown. Bank's freedom not to deal with WRC is not restricted by WRC's relationship with Uptown. If WRC decides independently not to continue as a joint venturer with Uptown, having learned of Bank's reason, Bank is not liable to Uptown for the harm caused. This is the scenario envisioned by the first illustration quoted above.

For Bank to be liable to Uptown on this tort theory, for refusing to deal with WRC, Bank must have used its own refusal to deal as a form of "affirmative inducement, compulsion or pressure" to make WRC break its contract with Uptown. *See* Restatement (Second) of Torts § 766, comment *l* at 13 (stating quoted standard). This is the scenario envisioned by the second illustration quoted above.

■ Assuming the truth of all well-pleaded allegations and giving Uptown the benefit of all favorable inferences that may be drawn therefrom, Uptown's fifth claim for relief is closer to the second illustration than to the first. Uptown alleged more than Bank's mere silent refusal to deal with WRC because of WRC's joint venture with Uptown; Uptown's complaint can be read to allege, further, that Bank told WRC that a loan would be forthcoming if WRC were to remove Uptown as its joint venturer and that Bank's purpose in telling that to WRC was to injure Uptown's economic relations with WRC. Under the principles discussed above, those allegations suffice to withstand a motion to dismiss the claim, because they describe a form of affirmative inducement for WRC to remove Uptown from the joint venture, without justification.

Therefore, the trial court erred in dismissing Uptown's fifth claim for relief. The Court of Appeals correctly reversed that dismissal.

## CONCLUSION

In summary, Uptown failed to state a claim with respect to the first through fourth claims for relief. Uptown stated a claim with respect to the fifth claim for relief.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed with respect to the first through fourth claims for relief and reversed with respect to the fifth claim for relief, and the case is remanded to the circuit court for further proceedings.

**UNIS, J.,** concurring.

With respect to Uptown Heights' first claim for relief — the claim for breach of the implied contractual duty of good faith and fair dealing — I write separately. I join that part of the court's opinion, because the court correctly states the law as announced by a majority of this court in *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 876 P2d 761 (1994) (4-2 decision). Nevertheless, I continue to disagree with the court's method of determining the objectively reasonable expectations of the parties in the performance and enforcement of a contract, because that method is inconsistent with

this court's decision in *Best v. U.S. National Bank*, 303 Or 557, 562, 739 P2d 554 (1987). *See Pacific First Bank*, 319 Or at 356-64 (Unis, J., dissenting) (criticizing majority's method and applying the analysis stated in *Best*).

"The purpose of the good faith [and fair dealing] doctrine is to prohibit improper behavior in the performance and enforcement of contracts." *Best*, 303 Or at 562. The court's method of determining objectively reasonable contractual expectations of the parties expressed in *Pacific First Bank* and in the present case fails to further that purpose. I am hopeful that, in the future, the court will reconsider its analysis and restore vitality to the implied contractual duty of good faith and fair dealing, consistent with its purpose.

Fadeley, J., joins in this concurring opinion.