Gary P. LEVER and Century 21 Action Realty, Inc., Appellants (Plaintiffs),

v.

COMMUNITY FIRST BANCSHARES, INC., and Timothy J. Anderson, Appellees (Defendants).

No. 99–46.

Supreme Court of Wyoming.

Nov. 8, 1999.

Mel Dunn of Mel Dunn, P.C., Casper, WY., Representing Appellants.

John I. Henley of Vlastos, Brooks, Henley & Drell, Casper, WY., Representing Appellees.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and HILL, JJ.

HILL, Justice.

Gary P. Lever and Century 21 Action Realty, Inc. appeal from an adverse summary judgment ruling in favor of Community First Bancshares, Inc. (the Bank) and Timothy J. Anderson (Anderson) on Lever's and Century 21's claims for slander and intentional interference with a contract or prospective advantage.

We affirm.

### ISSUES

Appellants present two issues for review on appeal:

Issue I: Did the District Court err by finding that there were no genuine issues of material fact and granting the Defendants' Motion for Summary Judgment?

Issue II: Did the District Court err by denying the Plaintiffs' Motion to Amend their Complaint to include two additional Defendants?

Appellees state the issues as:

Issue I: Did the Appellees convey false information about Appellant Gary Lever to Dan Carlin?

Issue II: Were the statements made by the Appellees a privileged publication to a third party?

Issue III: Did the Appellees have the requisite degree of fault required for a claim of slander?

Issue IV: Was there any improper interference by the Appellees with the contract or prospective economic gain of the Appellants?

Issue V: Are the damages claimed by the Appellants so speculative that the intentional interference claims must fail for lack of the required damage element?

## FACTS

Appellant Gary Lever is a real estate agent who works in the office of Century 21 Action Realty. In August of 1997, Lever entered into a contract with Pastor Dan Carlin and the Word Christian Fellowship Church for the purpose of purchasing, repairing, and selling dilapidated property. Lever also agreed to provide "consulting services for Word Christian Fellowship Church in exchange for listing on properties purchased to be resold."

Pastor Carlin approached the Bank about financing for the project. The Church was a customer of the Bank. Anderson, a loan officer with the Bank, consulted with two other bank officers, Rick Kellogg and Vance Sprecher, who had prior experiences relating to financial dealings with Lever. Based on the information supplied by the other officers, Anderson informed Pastor Carlin that approval for a loan was unlikely so long as Lever was involved in the project. In an apparent attempt to clarify the Bank's position, Pastor Carlin called Anderson and surreptitiously recorded the conversation.[1] It was during this conversation that the alleged slanderous statements were uttered by Anderson:

[Anderson]: Ya, I, I've had, you know, in my investigations, I've had, had more than one person tell me that you, you need to kinda count your fingers after you shake hands with Gary Lever, and I'm, I'm a little uncomfortable with that myself, [Pastor Carlin], and I'll tell you why. Because I know you, I've met you, we've visited a few times and things, but, I've never met Gary, I mean, you know, so what I'm really telling you is, is ah, ah, second hand, but, I, I, it comes up, it comes up, it comes up every time the name comes up, you know, people have bad things to say, so, ah, I'm concerned that he—

[Pastor Carlin]: Is it, do they have proof or evidence or anything like that?

[Anderson]: Well—

[Pastor Carlin]: Or is it just hearsay?

[Anderson]: Ah, ah, some of it is regarding past dealings that he, he's had with, with ah, these individuals, and, ah, you know, so ya, I guess it, you know, their experience[s] were first hand, so—

. . . .

[Pastor Carlin]: You know, what if somebody's making up rumors about him?

[Anderson]: Well, you [k]now, hell, I can't go into a great deal of detail, you know, obviously, but you know the people I've talked to are, are, ah, trust, trustworthy and are within my confidence. I mean, they are people that I would believe, um, when they tell me these kind of things, so, so—

Pastor Carlin understood these statements to mean that Lever was dishonest and unscrupulous, and that the Church could lose its money if Lever got possession of it. Based upon that understanding, Pastor Carlin canceled the contract with Lever.

1. For a complete transcript of the conversation see Appendix.

Lever then filed suit against the Bank and Anderson alleging claims of slander, intentional interference with a contract and/or interference with a prospective advantage. After discovery, Lever filed a motion to amend the complaint to add as defendants Bank officers Sprecher and Kellogg. The Bank and Anderson countered with a motion in opposition to the amendment and a motion for summary judgment. The district court subsequently granted the motion for summary judgment on the grounds that Anderson's statements were true, and that there was no evidence that the defendants were intentionally trying to interfere in the contract between the Church and Lever. Since the district court had ruled against Lever on all claims, it also denied the motion to amend on the grounds that the same result would apply to the other prospective defendants. Lever now appeals the denial of the motion to amend his complaint and the granting of summary judgment in favor of defendants to this Court.

## STANDARD OF REVIEW

In reviewing summary judgments, our standard is well established:

" 'When a motion for summary judgment is before the supreme court, we have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did he. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.' *Reno Livestock Corporation v. Sun Oil Company (Delaware)*, Wyo., 638 P.2d 147, 150 (1981). See also, *Blackmore v. Davis Oil Company*, Wyo., 671 P.2d 334, 336 (1983).

"A summary judgment should only be granted where it is clear that there are no issues of material facts involved and that an inquiry into the facts is unnecessary to clarify the application of law. *Johnson v. Soulis*, Wyo., 542 P.2d 867 (1975). A material fact is one which has legal significance. *Johnson v. Soulis*, supra. It is a fact which would establish a defense. *Wood v. Trenchard*, Wyo., 550 P.2d 490 (1976). After the movant establishes a prima facie case the burden of proof shifts to the opposing party who must show a genuine issue of material fact, *Gennings v. First Nat'l Bank of Thermopolis*, Wyo., 654 P.2d 154 (1982), or come forward with competent evidence of specific facts countering the facts presented by the movant. *Matter of the Estate of Brosius*, Wyo., 683 P.2d 663 (1984). The burden is then on the nonmoving party to show specific facts as opposed to general allegations. 10 Charles Alan Wright, Arthur. R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil § 2727, p. 538. The material presented must be admissible evidence at trial. Conclusory statements are not admissible. *Bancroft v. Jagusch*, Wyo., 611 P.2d 819 (1980). We give the party defending the motion the benefit of any reasonable doubt." *Roth v. First Security Bank of Rock Springs, Wyoming*, Wyo., 684 P.2d 93, 95 (1984).

*Mercado v. Trujillo*, 980 P.2d 824, 825–26 (Wyo.1999) (quoting *Nowotny v. L & B Contract Industries*, 933 P.2d 452, 455 (Wyo. 1997), and *Thomas by Thomas v. South Cheyenne Water and Sewer District*, 702 P.2d 1303, 1304 (Wyo.1985)).

"We will affirm a grant of summary judgment if it can be sustained on any legal ground appearing in the record." *Duncan v. Town of Jackson*, 903 P.2d 548, 551 (Wyo. 1995).

## DISCUSSION

*Slander*

 Slander is an oral defamatory communication. "A defamatory communication

is one which tends to hold the plaintiff up to hatred, contempt, ridicule or scorn or which causes him to be shunned or avoided; one that tends to injure his reputation as to diminish the esteem, respect, goodwill or confidence in which he is held." *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211, 224 (Wyo.1994) (quoting *Tschirgi v. Lander Wyoming State Journal,* 706 P.2d 1116, 1119 (Wyo.1985)). To be actionable, the defamatory or disparaging words "must affect the plaintiff in some way that is peculiarly harmful to one engaged in his trade or profession." *Wilder,* 868 P.2d at 224 (quoting Restatement (Second) of Torts § 573 at 194, cmt. e).

■ The district court granted summary judgment on the grounds that the statements by Anderson were true. Lever disputes this conclusion. The essence of his argument is that bad credit is not necessarily synonymous with the implication of Anderson's statements that he was dishonest. Our review of the record leads us to agree with Lever. Viewing the evidence in the light most favorable to Lever, as we must at this stage of the proceedings, it is reasonable to interpret Anderson's statements as directly impugning Lever's professional reputation by implying that he was dishonest. Further, the evidence is contradictory as to whether Lever's credit history is indicative of dishonesty or merely a lack of business acumen. On this basis, we would have to conclude that there are material facts in dispute which would foreclose a summary judgment.

■ However, that does not end our inquiry. As noted above, we may affirm a summary judgment on any legal grounds appearing in the record. In support of their motion for summary judgment below, the defendants also raised the claim that Anderson's statements were protected by a conditionally qualified privilege. Whether such a privilege exists is a question of law. Restatement (Second) of Torts § 619 at 316, cmt. a (1977); *Swinton Creek Nursery v. Edisto Farm Credit,* 334 S.C. 469, 514 S.E.2d 126, 134 (1999).

■ We addressed the concept of privilege as related to an alleged slanderous statement in the context of a business transaction in *Williams v. Blount,* 741 P.2d 595 (Wyo.1987). In *Williams,* the seller had ordered a lender's insurance policy from a title insurance company for the sale of his property. During a conversation with the buyer, an officer of the title insurance company stated that the company would not do business with the buyer unless he guaranteed payment because the seller was having financial difficulty. *Id.* The seller subsequently sued for defamation, and the district court granted summary judgment for the title insurance company on the grounds that the statement was a conditionally privileged communication. *Id.* at 595–96. It is worth quoting at length our disposition of the plaintiff's defamation claim on appeal:

What is libel or slander as a matter of law is wholly dependent on the surrounding circumstances and the subject matter of the communication. The acceptance of a conditionally privileged communication was established nearly a half century ago:

" 'In those cases where one person has an interest in the subject matter of the communication and the person to whom the communication is made has a corresponding interest, every communication honestly made in order to protect such common interest is privileged by reason of the occasion.' " *Sylvester v. Armstrong,* 53 Wyo. 382, 84 P.2d 729, 732 (1938), quoting from Newell, Slander & Libel § 432 (4th ed.).

A similar case involving the subject rule is *Lull v. Wick Construction Company,* Alaska, 614 P.2d 321 (1980). See also Prosser and Keeton on Torts § 115, pp. 828–830 (5th ed.1984) and *Foothill Industrial Bank v. Mikkelson,* Wyo., 623 P.2d 748 (1981).

The subject matter of the communication in this case was a routine business transaction in which both parties had pecuniary interest. See Restatement of Torts 2d § 596 [1977]; Hansen, Libel and Related Torts § 126, p. 97 (1969). Under the doctrine of conditionally privileged communication, an absence of malice is presumed; malice on the part of a defendant must be established by a plaintiff.

"The communication in such case will, prima facie, be considered as having been made in good faith—i.e., without malice, and the burden of proving the existence of malice is cast upon the person claiming to have been defamed." *Sylvester v. Armstrong*, 84 P.2d at 733. Malice is a necessary element to move the communication out from under the protective doctrine of conditionally privileged communication. The lower court concluded there was no malice.

" ' * * * [I]t is within the power and duty of the court to say as a matter of law that the motive of the [communication] was without malice.' " *Id.* at 84 P.2d at 734, quoting from *Williams v. Standard–Examiner Pub. Co.*, 83 Utah 31, 27 P.2d 1, 17 (1933).

Given the framework of a conditionally privileged communication, an absence of malice entitles the defendant to judgment as a matter of law. *Phifer v. Foe*, Wyo., 443 P.2d 870 (1968); *Tschirgi v. Lander Wyoming State Journal*, supra, 706 P.2d 1116.

*Williams*, 741 P.2d at 596–97.

■ In the instant case, we conclude that, as a matter of law, a conditionally qualified privilege exists. Like the situation in *Williams*, this case involves a routine business transaction. Contrary to Lever's assertions, there is a common interest in the subject matter of the communication between Anderson and Pastor Carlin. The Pastor approached the Bank about a prospective loan to finance his business venture with Lever. Clearly, the Bank has an interest in any money it is being asked to loan, as does the recipient of that loan. The Bank has a legitimate interest in assuring repayment of that loan and a concomitant interest in the purposes for which the recipient plans to utilize the loan. Similarly, the prospective borrower has an obvious interest in the loan—to further the business venture. The Bank had a right to seek assurance that the loan would be repaid and that it would not be forced to foreclose on any of the Church's assets in the event of a default; a scenario in which the Church undoubtedly also had an interest. *See Williams*, 741 P.2d at 597; Restatement (Second) of Torts §§ 595–596 at 268–277 (1977). Therefore, we conclude that a conditionally qualified privilege existed covering the statements by Anderson to the Church.

■ Our review of the record also leads us to conclude that there are no material facts which could negate the conditionally qualified privilege. The statements were made in the context of an ordinary business transaction initiated by Pastor Carlin. See Restatement (Second) Torts § 595 at 273–74, cmt. j (The fact that communication was at the behest of a person whose interest was concerned is an important factor.). In addition, a review of the transcript of the conversation in which Anderson made the allegedly defamatory statements shows that the communication was made entirely within the context of the proposed loan. *See* Appendix. In his reply to the defendant's motion for summary judgment, Lever failed to cite any specific evidence of malice on the part of Anderson. Under these circumstances, we can only conclude that Anderson did not act with malice when he made the statements.[2] Therefore, the defendants were entitled to summary judgment as a matter of law on the claim for slander. *See Williams*, 741 P.2d at 597.

*Intentional Interference with a Contract and/or Prospective Advantage*

■ This Court has adopted the Restatement (Second) of Torts §§ 766 and 766B, intentional interference with a contract and intentional interference with prospective contractual relations, respectively. *First Wyoming Bank, Casper v. Mudge*, 748 P.2d 713, 715 (Wyo.1988), and *Martin v. Wing*, 667 P.2d 1159, 1161–63 (Wyo.1983). The elements of intentional interference with a contract are: (1) the existence of the contract; (2) the defendant's knowledge; (3) intentional and improper interference inducing or

---

**2.** While *Williams* uses a malice standard, the Restatement (Second) of Torts, §§ 595 and 596, uses an actual knowledge or reckless disregard as to falsity as the standard for negation of the conditionally qualified privilege. Neither party advocated a change in our precedent, and we decline to raise the issue on our own initiative.

causing a breach; and (4) resulting damages. *Mudge,* 748 P.2d at 715. The elements for intentional interference with prospective contractual relations provide:

"One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

"(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

"(b) preventing the other from acquiring or continuing the prospective relation."

*Martin,* 667 P.2d at 1162.

■ Lever argues that Anderson's comments caused the Church to cancel the contract with him and, thereby, interfered with his contractual relationship. Lever's claim is inextricably intertwined with his position that Anderson's comments were slanderous. As we noted above, those comments were a privileged communication, and there was no evidence in the record that Anderson acted with any malice in making the statements. On that basis, Lever's claims for intentional interference with a contract or prospective advantage would fail for lack of evidence on the key element of both causes of action—that Anderson's intent was improper.

■ On an even more basic level, "the general rule is that, ordinarily, one may refuse to deal with another and not be liable in tort for that refusal." *Uptown Heights Associates Limited Partnership v. Seafirst Corporation,* 320 Or. 638, 891 P.2d 639, 647 (1994); Restatement (Second) of Torts § 766 at 8, cmt. b (1979). The Bank could refuse to deal with the Church for any reason, including its relationship with Lever. 891 P.2d at 648. In order for any liability to attach for a failure to deal, the Bank had to have used some "affirmative inducement, compulsion or pressure" to make the Church break its contract with Lever. *Id.* (quoting Restatement (Second) of Torts § 766 at 13, cmt. l). Nothing foreclosed the Church from seeking financing at another financial institution. Indeed, the record discloses that the decision to

cancel the contract was solely the initiative of the Church and Pastor Carlin. The Bank cannot be held liable for the actions of the Church regarding the contract under these circumstances. Therefore, the district court correctly granted summary judgment in favor of the defendants.

*Motion to Amend Complaint*

■ The final issue presented on appeal by Lever is the district court's refusal to grant his motion to amend the complaint to add additional bank officers as defendants to this action. This issue is essentially moot since Lever's claims against the additional defendants is based upon the same set of facts as those which are the basis for his claims against Anderson and the Bank. Since those claims have been decided adversely to Lever, and a similar result would obtain against the proposed additional defendants, the district court's decision denying the motion to amend is affirmed.

### CONCLUSION

We affirm the district court's grant of summary judgment on the alternative grounds appearing in the record that the conversation between the Bank loan officer and its customer was covered by a conditionally qualified privilege, and the record fails to disclose any evidence that the statements were made with the requisite malice necessary to negate the privilege. The plaintiff's claims for intentional interference with a contract and/or a prospective advantage were also properly disposed of by summary judgment since the defendants did not induce the Church to break its contractual relationship with Lever. The plaintiffs' motion to amend their complaint to add additional defendants was properly denied by the district court because the disposition of their claims on summary judgment would have applied likewise to those defendants.

Affirmed.

### APPENDIX

Telephone Rings

Good afternoon, Community First.

DC: Tim Anderson, please

Just a moment.

TA: This is Tim, can I help you?

DC: Hi Tim, Pastor Carlin again.

TA: Hi.

DC: Hey, Um, If I got another realtor to ah, to do this instead of Gary Lever, would that then be, ah,

TA: Another realtor, as in——

DC: If I did the deal with another realtor instead of such and such, you have a problem with Gary.

TA: That's, that's, you know, if Gary had, is Gary removing himself from the thing, or what?

DC: No, this is me, I haven't discussed it with him yet.

TA: O.K.

DC: I'm just thinking that, you know,

TA: Well, why, why, my question would be, why would you need a realtor?

DC: You think I could just do it myself?

TA: Well, Um, what are you going to do? I mean, ah, I would, I would look at what needs to be done first and then, ah, ya,

DC: I think, I think we could, I think we could by [sic] the property for like six grand, I think we could clean it out.

TA: uh-huh.

DC. Which would cost three, four hundred dollars.

TA: Uh-huh.

DC: And I think I could sell it immediately for double what I paid for it, just by cleaning it out.

TA: And not put any money into it.

DC: Right.

TA: Ya.

DC: I'm trying to find a way, this is all, this, you know, as I told you, this is just for the church.

TA: Right.

DC: and, and to make money for the Church. We want.

TA: Ya.

DC: and ah, try to find, the bible says be as wise as serpents but as gentle as doves, and we are trying to find some legitimate ways where we could create some assets.

TA: I don't, don't get me wrong Dan, I'm not, I'm not questioning the legitimacy of what you are trying to do. What I was, you know, my intentions were to warn you off of what I thought could have been a potentially, ah, ah, expensive situation for you.

DC: Well, it kind of stunned me because, you know, I've never really done any business dealings with Tim, and he has only come to church about three times.

TA: uh-huh.

DC: You know, and I was thinking about getting him involved in some other things, and there's you know, some legitimate things happening I, you know, I don't want to, I don't want to get messed up with that.

TA: Ya, I, I've had, you know, in my investigations, I've had, had more than one person tell me that you, you need to kinda count your fingers after you shake hands with Gary Lever, and I'm, I'm a little uncomfortable with that myself, Dan, and I'll tell you why. Because I know you, I've met you, we've visited a few times and things, but, I've never met Gary, I mean, you know, so what I'm really telling you is, is ah, ah, second hand, but, I, I, it comes up, it comes up, it comes up every time the name comes up, you know, people have bad things to say, so, ah, I'm concerned that he

DC: Is it, do they have any proof or evidence or anything like that?

TA: Well,

DC: Or is it just hearsay?

TA: Ah, ah, some of it is regarding past dealings that he, he's had with, with ah, these individuals, and, ah, you know, so ya, I guess it, you know, their experience[s] were first hand, so.

DC: And what, well see, I, it, you know, I would think that, you know, I would

assume a realtor would, you know, have to write it up a certain way and of course I'd look at it and you guys would look at it, it would be, you know, it couldn't be some way he could rip some, somebody off; you know.

TA: Ya, as far as buying the property, probably not, but you know, fixing it up and how the funds get handled, and, and who handles the transaction when it's sold and, you know, whether or not, ah, you know, you get your, you know, you recover your investment and things like that, those would be my concerns. Life's too short, right? I mean, why would you want to, why would you want to ——

DC: Well, I'll tell you that, that stunned me about Gary, because I've never, you know, with me he has always seemed to be very honest.

TA: Ya.

DC: You know.

TA: Well, you know, and I'm not saying that a person can't change, don't get me wrong, but, you know, ahhhhhh, ummm, I, I, I did feel a little compelled, you know, you are our customer, and I did feel compelled to warn you about what I've heard and obviously I hope you use that, ah, information in the, um, um, careful manner, because ah, umm, you know, ah, Gary, like I say, I don't know Gary and, and a, I'm not accustomed——

DC: Well, you know, what, what I feel sad about is, is, you know, If I didn't do this with him—

TA: Uh-huh.

DC: I would feel like, and what if it's not true.

TA: Uh-huh.

DC: You know, what if somebody's making up rumors about him?

TA: Well, you know, hell, I can't go into a great deal of detail, you know, obviously, but you know the people that I've talked to are, are, ah, trust, trust-worthy and are within my confidence. I mean, they are people that I would believe, um, when they tell me these kinds of things, so, so——

DC: So, in a, in a sense it's like, you know, I feel like we are getting to be the victim here also that, that, be-cause——

TA: Ya, I understand, you got a problem to [sic] because Gary's the one that brought this up to you, so if you, if you capitalize on this opportunity, now, ah, you know, I mean, ah, without, without including him, it's, it's a tough spot for you. I understand, especially if you start to come to your church and things like that. You know, what I'm telling you is basically that I don't, you know, with Gary Lever's name on this thing, I don't think it's flying through this bank.

DC: So the bank would deny me, I mean, for instance, if we are legitimate, you know, the church, and if we get money, now, whether we hire, if we happen to hire somebody someone that is unscrupulous——

TA: Uh-huh,

DC: Ah, then that's our problem.

TA: Ya, I understand that.

DC: Because you guys would be prote[c]t-ed.

TA: Ya, I understand that. We, We could, We could shore this thing up and we could, we could collateralize it and ah, ah, make sure that the bank wouldn't take a loss, but at the same time, I'm not anxious to, if, if, if you get into a partnership with somebody, if the church gets into a partnership with somebody, and it goes sour, you know, ——

DC: Well, you guys are-

TA: And I'm trying to warn you guys off on the thing and now I'm in there having to liquidate collateral or something like that and, and, ah, which you now, ah, it hurts the church, you know, obviously, and the whole congregation, it's a, it's a tough situation.

DC: O.K. Well, I think that the amount that we are talking about, isn't, wouldn't hurt the church and, ah, ah, we could handle it.

TA: Ya.

DC: If, if he did the worst. If Gary Lever did the worst, I don't think that it would, ah, I think we would survive and so would the bank and I think our collateral would handle it, but of course, you don't want to step in and have to do that to a church, I understand that.

TA: That's, you [k]now, I've never had to, I've made loans to churches in the past and I've never had to. I've came, you know, its gotten dangerously close a time or two. That is just a very uncomfortable situation. I'm sure you can understand that. I mean, I don't want to have to look at all of you parishioners in the eye and say, I'm sorry but I gotta take the place where you go to church away from you, you know.

DC: I would just think that it could be written up in a way that Gary Lever couldn't, couldn't rip us off

TA: Well, what, what maybe we do is that, take a look at what it is going to cost you to buy it, what is the cost to clean it up, what is it going to cost you to fix it up, if you are going to fix it up, and then let's talk about how we could collateralize that thing. One of the; one of the easiest ways to do this thing through the bank, is to, maybe take some of the churches [sic] deposits, put them in the form of a CD, pledge the CD against the loan, and we don't worry about any real estate or anything like that. That way, when the thing, ah, pays off; you have got the CD money available to you again, you know, plus you have, plus you have been able to obtain the real estate.

DC: What's a CD money.

TA: That is a certificate of deposit.

DC: How do I go about getting one of those?

TA: Um, do you have ah, you have deposits with this bank do you not? I could probably just transfer some into the form of a CD. Now I don't know, it would have to be money that you don't have earmarked for something else or don't intend to spend, you know, in the near future, but——

DC: In, In my guts, I don't think Gary would, would mess with the church or try to do anything to me. I, I just don't, or to the church, I just don't think he would do it.

TA: Uh-huh.

DC: And that saddens me that people would think that.

TA: Ya, you know, it's, it's, and again Dan, you know, I brought it up, and I brought it to your attention, because, you know, um, we are concerned about your well being, you know, you are, you are and have been a loyal customer of this bank. You know, that's why we are pointing it out to you. So

DC: So, if—

TA: I want you -

DC: So, So if he is involved in it, you wouldn't, you wouldn't loan it to us?

TA: I don't think we would get it done. I don't think we would get it done.

DC: Well, maybe try to find a way to do it, to do it so he is not on the paper.

TA: Well, outside of the deal somehow.

DC: Fine.

TA: O.K

Conversation ends at that point.